Jesse James **GILBERT**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 19940.

United States Court of Appeals
Ninth Circuit.

Sept. 16, 1966.

Rehearing Denied Oct. 24, 1966.

Browning, Circuit Judge, dissented in part.

James F. Kirkham, San Francisco, Cal., for appellant.

Manuel L. Real, U. S. Atty., John K. Van De Kamp, Asst. U. S. Atty., Chief, Crim. Div., J. Brin Schulman, Asst. U. S. Atty., Asst. Chief, Crim. Div., Kevin O'Connell, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before BARNES, BROWNING, and DUNIWAY, Circuit Judges.

BROWNING, Circuit Judge:

Jesse James Gilbert appeals from his conviction of the armed robbery of four banks in violation of 18 U.S.C.A. § 2113 (a) and (d).

I

Appellant contends that objects taken from his person at the time of his arrest were erroneously admitted in evidence because the arrest was made without probable cause.

Two warrants for appellant's arrest for bank robbery were outstanding. The validity of these warrants is not questioned. Rather, appellant contends that

at the moment of arrest the officers lacked probable cause to believe the person they arrested was appellant.

At the hearing on appellant's motion to suppress, the FBI agent who made the arrest testified as follows. On the night of February 26, 1964, he and three other agents were sent by their superior officer to the corner of Frankford and Levick streets in Philadelphia, Pennsylvania. They had been told that appellant might be in that vicinity. They had read a full description of appellant, and had examined his photograph. They had been told that appellant had been identified while purchasing a hair piece and would probably be wearing it, and that he would probably be wearing dark-rimmed glasses. They had known of the outstanding warrants. They had known that appellant was also charged with shooting and killing a policeman with a .45-caliber weapon, that he was armed with such a weapon, and that he was considered extremely dangerous.

Arriving at the designated corner, the agents observed a man in an outdoor phone booth, and approached to identify him. Because there was no light in the phone booth, the man—appellant—"was taken hold of by the arm and pulled outside. Nothing—it was general [sic]. Not a violent gesture." As appellant emerged from the dark phone booth into the lighted street, the arresting agents saw that he wore a hair piece and dark-rimmed glasses.

Appellant was asked to identify himself. He took his wallet from his rear pocket and showed the agents a driver's license, bearing a false name. The arresting agent took hold of appellant's left arm. Feeling something hard, he unzipped appellant's jacket, and from a "quick-draw" holster removed a loaded .45-caliber automatic with a shell in the chamber, ready to fire. A tattoo mark appellant was known to have was found on his left forearm. Appellant then admitted his identity.

■ The district court concluded there was probable cause to arrest appellant when the arresting agent saw appellant's hair piece and dark-rimmed glasses. Appellant does not seriously contest this conclusion.[1] However, he contends that the arrest occurred earlier—either when the FBI agents blocked his exit from the phone booth, or when they physically removed him from it—and that at neither instant did the agents have probable cause to believe that he was the man named in the warrants.[2]

We think the actions of the agents, prior to the moment they acquired probable cause to arrest, were reasonable, and did not violate appellant's Fourth Amendment rights.

If the agents had simply accosted appellant and asked him to identify himself, no one could question the propriety of their conduct. Cf. Keiningham v. United States, 307 F.2d 632, 633 (D.C. Cir. 1962); Green v. United States, 259 F.2d

1. On cross-examination the arresting officer testified that he did not "know" the arrested man to be appellant, even after he had seen the hair piece and glasses. But he also testified that he did not "know" it to be appellant until he had checked his fingerprints, even though appellant had in the meantime exposed an identifying tattoo and twice expressly acknowledged his identity. It is clear that the agent was referring to positive identification and not probable basis for belief.

2. Appellant also contends that Beck v. State of Ohio, 379 U.S. 89, 97, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964), imposed a duty upon the government to produce the testimony of the superior officer of the arresting agent from whom the latter obtained the information relied upon to constitute probable cause. In this case, unlike Beck v. State of Ohio, the arresting officer identified his informant (the superior officer) and detailed the information he supplied. We think this was enough in the absence of some suggestion, either from appellant or on the face of the record, sufficient to alert the trial court to a need for further inquiry into the reliability of the information. See Travis v. United States, 362 F.2d 477, 481 (9th Cir. 1966); Williams v. United States, 113 U.S.App.D.C. 371, 308 F.2d 326, 327 (1962). Cf. United States v. Bianco, 189 F.2d 716, 719 (3d Cir. 1951).

180, 181 (D.C. Cir. 1958); La Fave, Arrest 345 (1965). They did more than that. They laid hands upon appellant, and constrained his physical movements. The question is whether this physical restraint, supported by less than probable cause to believe the person affected was the one named in the warrant, violated the Fourth Amendment.

■ Relying primarily upon Rios v. United States, 364 U.S. 253, 262, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960), we have recently held that "there is nothing ipso facto unconstitutional in the brief detention of citizens under circumstances not justifying an arrest, for purposes of limited inquiry in the course of routine police investigations"; and that the test of the validity of such a brief detention is whether "from the totality of the circumstances" it appears that the detention was based upon "reasonable grounds" and "was not arbitrary or harassing." Wilson v. Porter, 361 F.2d 412 (9th Cir. 1966). Supporting authority from this court includes Davis v. People of State of California, 341 F.2d 982, 986 (9th Cir. 1965); Lipton v. United States, 348 F.2d 591, 593 (9th Cir. 1965); Busby v. United States, 296 F.2d 328, 331 (9th Cir. 1961).[3]

■ Substantial considerations favor the recognition of a carefully limited right of brief police detention on less than probable cause to believe the person detained has committed a felony. If even slight interference with freedom of personal movement is invariably conditioned upon a showing of prior probable cause, then either the standard of probable cause will be lowered, and with it the protection against formal arrests and substantial interferences with liberty; or police activity which appears perfectly proper when measured against a standard of reasonableness will nonetheless be forbidden. American Law Institute, Model Code of Pre-Arraignment Proce-

dure, Tent. Draft No. 1, Commentary 95–97 (1966); Bator & Vorenberg, 66 Colum.L.Rev. 62, 64–67 (1966); La Fave, Arrest 346 (1965); Note, 78 Harv.L.Rev. 473, 474–75 (1964); Barrett, 1960 Sup. Ct.Rev. 47, 65–66 (Kurland ed.); Leagre, 54 J.Crim.L. 393, 416–20 (1963).

On the other hand, it must be recognized that the potential for serious abuse of a police power to detain on less than probable cause is great, and the exercise of that power must be subjected to closest judicial scrutiny.

■ Moreover, any official exertion of custody over the person is a "seizure" within the meaning of the Fourth Amendment, and may be sustained only if not "unreasonable" under the circumstances. A.L.I. Model Code, supra, at 94–95; Bator & Vorenberg, supra, 66 Colum.L. Rev. at 65–66; Leagre, supra, 54 J.Crim. L. 396, 419–20. See also Schmerber v. State of California, 384 U.S. 757, 767–768, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

■ The agents' conduct in the present case met the standard of reasonableness. Their duty, imposed by the warrant, was to find appellant and arrest him. They had substantial reason to believe he might be in the immediate vicinity. It was proper to identify anyone in the area who met appellant's general description. Appellant could not be seen clearly in the darkened phone booth. To give him notice, no matter how short, by asking him to step into the light might have imperiled life, for appellant had demonstrated his willingness to kill to avoid arrest, and he was known to be armed. His removal from the phone booth was accomplished with minimum force. The period of involuntary detention before probable cause was acquired was short—seconds at most. It was neither longer nor more oppressive than necessary to the discharge of the agents'

---

3. The Court of Appeals for the Second Circuit has gone farther, permitting detention of substantial duration without probable cause. See United States v. Middleton, 344 F.2d 78, 80–81 (2d Cir. 1965) (dictum); United States v. Vita, 294 F.2d 524, 529–530 (2d Cir. 1961).

duty to identify appellant and arrest him, and it was put to no other purpose.[4]

## II

Appellant sought to exclude the testimony of various witnesses identifying him as a participant in the robbery of the respective banks, on the ground that these courtroom identifications were based in whole or in part upon (1) a prior examination by each witness of a photograph of appellant which was unlawfully seized during an illegal search of appellant's apartment; and (2) a prior viewing of appellant at an unlawful police lineup.

### A. Seizure of the Photograph

The circumstances leading to the seizure of the photograph were as follows. At approximately 11:00 a. m. on January 3, 1964, two armed men robbed the Mutual Savings and Loan Association of Alhambra, California.[5] A police officer was shot and killed. One of the robbers was wounded, but both escaped. Shortly thereafter the automobile which the robbers had driven from the bank was found abandoned about eight blocks away. The wounded robber was found in a second automobile nearby, and was taken to a hospital. A witness reported that two men had driven away from the scene in a third automobile. These facts were related to an FBI agent who arrived upon the scene about noon. He radioed the information to his office.

Another FBI agent was dispatched to the hospital to interview the wounded robber. The interview continued intermittently over several hours. The wounded man, Edgar Weaver, died at 9:00 p. m. that evening. Early in the interview, Weaver admitted his participation in the robbery, and said that a man named "Gilbert" was his accomplice. The agent telephoned this information to his office. Weaver then "came up with the name 'Skinny Gilbert.'" The agent called his office with this additional information, and, in response, his office gave him appellant's name, "Jesse James Gilbert," and asked the agent to find out from Weaver if he was the one. Weaver confirmed this identification. He also reported, accurately, that appellant was then a prison escapee. Weaver also told the agent that he and appellant spent the previous night in apartment 28 of an apartment house with an "Hawaiian-sounding" name located two blocks from the corner of Los Feliz Boulevard and Riverside Drive in Glendale, California. The agent immediately informed his office. It was then about 12:30 p. m.

The FBI office, by radio, dispatched another man, Agent Keil, to the indicated area with instructions to locate the apartment; and instructed two other agents, Agents Schlatter and Onsgard, to join with local police officers, secure arms, and proceed to the area. Agent Keil located the "Lanai Apartments" at 3717 Los Feliz Boulevard, near Riverside Drive, and advised his office. He then spoke to the manager, who told him that "Robert Flood," in whose name apartment 28 was rented, had just left through an exit to a rear driveway, stating that he was going to San Francisco for several days. Agent Keil immediately checked the driveway but saw no one. A stairway led from the driveway to the second floor where apartment 28 was located. Agent Keil secured the key to apartment 28, and turned it over to Agents Schlatter and Onsgard, who had just arrived.

Agents Schlatter and Onsgard had picked up local police reinforcements and arms, as instructed, and proceeded to the address of the apartment house relayed to them by radio, arriving three or four minutes after Agent Keil. They had been advised by radio of other pertinent information, outlined above, as it was ob-

---

4. Detention for identification alone is to be distinguished from detention for interrogation, which may collide with the premises of the accusatorial system (Leagre, supra, 54 J.Crim.L., at 417–18), or from detention as a subterfuge to justify a war-

rantless search. Cf. State of Montana v. Tomich, 332 F.2d 987, 989 (9th Cir. 1964).

5. This robbery is not one of the four involved in this appeal, which involved other banks and occurred a month earlier.

tained. Agent Schlatter was also aware, from his own knowledge, that there was an outstanding warrant for the arrest of appellant as a prison escapee.

The FBI agents and police officers surrounded the building. Agent Schlatter with others, armed with shotguns and pistols, approached apartment 28. Agent Schlatter unlocked the door, and he and the others entered. Looking for anyone who might be within, they searched through the rooms, under beds, and in closets. The apartment was empty. About the apartment, in plain view, were a notebook opened to a sketch, marked "Alhambra" and depicting the area of the robbed bank, a quantity of currency, a clip from a .45-caliber pistol, and an envelope of the type used to deliver photographs. Nothing but the pictures was disturbed. These were taken immediately to the robbed bank to determine whether any of the witnesses could identify the person in the photographs as one of the robbers. The other items were seized subsequently under a warrant secured several hours later—this seizure is not now questioned.

At trial the government did not rely upon the seized photographs as evidence.[6] Appellant, in cross-examining witnesses who identified him as a participant in the robberies involved here, brought out the fact that prior to the trial most of the witnesses had identified appellant from photographs, including one of those taken from appellant's apartment. Appellant argues that the courtroom identification should have been suppressed as fruits of an unlawful seizure. Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).[7]

Appellant's contention was rejected by the California Supreme Court in an ap-

peal from his conviction of the murder of the police officer. People v. Gilbert, 63 Cal.2d 690, 47 Cal.Rptr. 909, 919–920, 408 P.2d 365, 374–375 (1965). We arrive at the same conclusion, holding, for reasons set out below, that (1) the entry and (2) the search, and (3) the seizure, were all lawful.

1. *The Entry.* Appellant argues that the FBI agents and police officers lacked probable cause to enter the apartment to make an arrest because (1) Weaver, the wounded man, was not known to them to be a reliable informer; and (2) the information which they had indicated that apartment 28 was unoccupied.

The second contention is quickly answered. As the agents and police approached the door to apartment 28, they knew that three men might have participated in the robbery; that only one—Weaver—was accounted for; and that the other two had fled in the same automobile. While one man had apparently left apartment 28, he might have returned by way of the rear stairs. Agent Schlatter testified that the agents and police entered the apartment for the purpose of making an arrest, believing one or more of the robbers might be within. The precautions which they took in surrounding the building, in approaching the apartment heavily armed, and in opening the door and entering without announcement reflected this purpose and belief.

Appellant's "probable cause" contention is also unfounded. "In testing the sufficiency of probable cause for an officer's action even without a warrant, we have held that he may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters

---

6. One of the pictures was received in evidence at the government's suggestion. However, the government made no affirmative use of the photograph at trial, either in examining the witnesses or in closing argument, and suggested its admission only after appellant had it marked for identification and used it extensively in cross-examination. In substance, if not

in form, the photo itself was introduced by appellant, and not by the government, and appellant has not argued to the contrary.

7. We pass the fact that appellant does not appear to have expressly raised this issue by an appropriate objection in the trial court.

within the officer's knowledge" (Jones v. United States, 362 U.S. 257, 269, 80 S.Ct. 725, 735, 4 L.Ed.2d 697 (1960)), and "is sufficiently accurate to lead the officers directly to the suspect." Wong Sun v. United States, 371 U.S. 471, 480, 83 S.Ct. 407, 413, 9 L.Ed.2d 441 (1963); see also Broeder, 42 Neb.L.Rev. 483, 501–02, 508–12 (1963). Weaver's information obviously met the requirement of particularity. We think it also satisfied the requirement of reliability.

It is true that the agents "had no basis in experience for confidence in the reliability of [Weaver's] information" (Wong Sun v. United States, supra, 371 U.S. at 480, 83 S.Ct. at 413), but "a substantial basis for crediting the hearsay" (Jones v. United States, supra, 362 U.S. at 272, 80 S.Ct. at 736) may be found in other circumstances, particularly in the officer's verification of details of the informant's statement before the officer acts. United States v. Nori, 352 F.2d 910, 911 (7th Cir. 1965); Katz v. Peyton, 334 F.2d 77, 78 (4th Cir. 1964); Jones v. United States, 326 F.2d 124, 128–129 (9th Cir. 1963); Costello v. United States, 324 F.2d 260, 262 (9th Cir. 1963); Naples v. United States, 113 U.S.App. D.C. 281, 307 F.2d 618 (1962); United States v. Irby, 304 F.2d 280, 283 (4th Cir. 1962); Rodgers v. United States, 267 F.2d 79, 85, 88 (9th Cir. 1959); Comment, 53 Calif.L.Rev. 840, 842 (1965); Note, 25 Ohio St.L.J. 502, 519 (1964).[8] The independent determination by the FBI office of appellant's full name from the nickname furnished by Weaver, and Weaver's confirmation of this identification; the verification of Weaver's information that appellant was an es-

capee; and the location of the Lanai Apartments, and of apartment 28, on the basis of Weaver's description, were facts known to Agent Schlatter which lent credence to Weaver's story. Moreover, a man of reasonable caution could find reason for reliance in the fact that Weaver was a fully confessed participant in the crime, mortally wounded, and beyond expectation of personal benefit by incriminating the innocent.[9] We conclude that reliance upon Weaver's information was reasonable; and, of course, his accusation established probable cause.

As we have noted, the FBI agents and local police broke into appellant's apartment without first announcing their authority and purpose as required by 18 U.S.C.A. § 3109. Appellant contends that the entry was for this reason unlawful. Wong Sun v. United States, supra, 371 U.S. at 482–484, 83 S.Ct. 407, 9 L.Ed.2d 441; Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958); Ng Pui Yu v. United States, 352 F.2d 626, 631 (9th Cir. 1965); Blakey, 112 U.Pa.L.Rev. 499, 516–26 (1964); Kaplan, 49 Calif.L.Rev. 474, 500–03 (1961).

Agent Schlatter testified that because of the possible presence of an armed murderer in the apartment he believed an announcement before entry might increase, "extremely," the personal peril to the officers. The Supreme Court of California has held that the entry into apartment 28 fell within an exception to the state's announcement requirement (Calif. Penal Code § 844) because compliance "might have alerted the suspect and increased the officers' peril." People v. Gilbert, supra, 63 Cal.2d 690, 47 Cal.Rptr.

---

**8.** Since Weaver was a confessed participant in the events which he reported, the adequacy of *his* basis for the information he provided could not be questioned. Cf. Aguilar v. State of Texas, 378 U.S. 108, 114, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

**9.** Weaver was unlike the usual informer, most of whom are encountered in narcotics cases. Comment, 53 Calif.L.Rev. 840, 850 n. 47 (1965). They are usually witnessing to secret transactions to which only they and the accused were privy.

They are often informing for hire. Commonly addicted themselves, they are often motivated by hope or promise of personal immunity from prosecution or leniency in punishment. See Note, 25 Ohio St.L.J. 502, 535 (1964); see also Jones v. United States, 105 U.S.App.D.C. 326, 266 F.2d 924, 928 (1959) (Miller, J., dissenting). In consequence, they are "frequently 'monstrous liars.'" See Perry v. United States, 118 U.S.App.D.C. 360, 336 F.2d 748, 749 n. 2 (1964).

at 919, 408 P.2d at 375. See also Ker v. State of California, 374 U.S. 23, 37–41, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).

■■ Although the question appears to be one of first impression, expressly reserved in Miller v. United States, supra, 357 U.S. at 309, 78 S.Ct. at 1190,[10] we think a similar exception is to be read into the unqualified language of 18 U.S. C.A. § 3109. This appears to be the common-law rule. People v. Maddox, 46 Cal.2d 301, 294 P.2d 6, 9 (Sup.Ct.Calif. 1956), quoted with approval in Ker v. State of California, supra, 374 U.S. at 39–40, 83 S.Ct. 1623; Restatement (Second), Torts § 206 comment d; Wilgus, 22 Mich.L.Rev. 798, 802 (1924); Blakey, 112 U.Pa.L.Rev. 499, 505–06 (1964). See also Accarino v. United States, 85 U.S.App. D.C. 394, 179 F.2d 456, 463 (D.C.Cir. 1949). Even the Justices who disagreed with the result in Ker v. State of California agreed that some exceptions to the rule of prior announcement are to be recognized. 374 U.S. at 54–65, 83 S.Ct. 1623. This much admitted, it would be difficult to justify refusal to excuse prior announcement where to require it would create palpable peril to the life or limb of the arresting officers. See Blakey, 112 U.Pa.L.Rev. 499, 542–43 (1964); Kaplan, 49 Calif.L.Rev. 474, 502 (1961). The entry of the agents was therefore lawful.

■ 2. *The Search.* Once lawfully on the premises the agents could properly observe what was in plain sight. Ker v. State of California, supra, 374 U.S. at 36–37, 83 S.Ct. 1623. Viewed realistically, this included the photographs. Although the photographs were in an envelope, the envelope was on top of a dresser and its exterior revealed its contents—it was the type of envelope commonly used in transmitting photographs, and was clearly marked with the name and address of the studio. See Chapman v. United States, 346 F.2d 383, 385–387 (9th Cir. 1965).

■ But even if discovery of the photographs involved a search, the search did not offend the Fourth Amendment. The officers had probable cause sufficient to support issuance of a search warrant; in addition to the information available before entry, the knowledge which the officers lawfully acquired of the sketch, the money, and the gun clip made the complicity of the former occupant or occupants in the bank robbery virtually certain. The officers had no search warrant, and since there was no arrest to which a warrantless seizure might be incident, the seizure was lawful only if necessitated by exigent circumstances (Cipres v. United States, 343 F.2d 95, 98 n. 9 (9th Cir. 1965)); but such circumstances were plainly present, for time was of the essence if the photographs were to assist in the indentification and pursuit of the fleeing robbers (Caldwell v. United States, 338 F.2d 385, 387 (8th Cir. 1964). See also, Schmerber v. State of California, supra, 384 U.S. at 770–771, 86 S.Ct. 1826, 16 L.Ed.2d 908; Ker v. State of California, supra, 374 U.S. at 41–42, 83 S.Ct. 1623; Cipres v. United States, supra, 343 F.2d at 98, last paragraph of n. 9). Discovery of the photographs was therefore lawful.[11]

■ 3. *The Seizure.* But this does not necessarily justify their seizure. As the Supreme Court said in Abel v. United States, 362 U.S. 217, 234, 80 S.Ct. 683, 695, 4 L.Ed.2d 668 (1960), "not every item may be seized which is properly inspectible by the Government in the course of a legal search; for example, private papers desired by the Government merely for use as evidence may not be seized, no matter how lawful the search which discovers them, Gouled v. United States, 255 U.S. 298, 310, 41 S.Ct. 261, 265, 65 L.Ed. 647 * * *." Appellant contends that his photographs fell within this rule.

The much criticized rule forbidding the seizure of "mere evidence" in an otherwise valid search has been recently re-

---

10. See also Ker v. State of California, supra, 374 U.S. at 40 n. 11, 83 S.Ct. 1623.

11. This being so, it makes no difference that at the time the photos were discovered the officers knew the apartment was unoccupied.

jected in notable decisions of the highest courts of California and New Jersey. People v. Thayer, 63 Cal.2d 635, 47 Cal. Rptr. 780, 408 P.2d 108 (1965); State v. Bisaccia, 45 N.J. 504, 213 A.2d 185 (1965). As an inferior appellate court, that course is not open to us. We may, however, in light of the substantial objections which have been raised to the rule,[12] confine its application to situations where it will clearly serve the purposes upon which it is said to be based.

 (1) *Self-incrimination*. Photographs of an accused, used only as a means of identification, are no more within the privilege against self-incrimination than his physical appearance (Smith v. United States, 117 U.S.App. D.C. 1, 324 F.2d 879, 882 (1963); United States v. Amorosa, 167 F.2d 596, 599 (3d Cir. 1948); 2 Wharton, Criminal Evidence § 659, p. 95 (1966 Cum.Supp.); 8 Wigmore, Evidence § 2265, p. 386–88 (12th ed. 1961); Inbau, Self-Incrimination 38–41 (1950); see also Schmerber v. State of California, supra, 384 U.S. at 763–764, 86 S.Ct. 1826, 16 L.Ed.2d 908; Holt v. United States, 218 U.S. 245, 252, 31 S.Ct. 2, 54 L.Ed. 1021 (1910)) and are in this respect indistinguishable from his fingerprints. United States v. Thompson, 356 F.2d 216, 224 n. 7 (2d Cir. 1965); Napolitano v. United States, 340 F.2d 313, 314 (1st Cir. 1965); Smith v. United States, supra, 117 U.S.App.D.C. 1, 324 F.2d at 882; United States v. Iacullo, 226 F.2d 788, 792 (7th Cir. 1955); United States v. Kelly, 55 F.2d 67, 68–69 (2d Cir. 1932); 1 Underhill, Criminal Evidence § 144, p. 270 (5th ed. 1956); Inbau, supra, 32–38. The only use made of the seized photographs was that of showing them to witnesses to the robberies for the purpose of identification. There is nothing to indicate that they were relied upon as being in any other way incrimi-

nating—for example, as connecting appellant with the stolen currency, the sketch of the robbery scene, and the cartridge clip also found in apartment 28.

 (2) *Privacy*. Since the photographs were either in plain sight following the officers' legal entry, or were disclosed in a proper though warrantless search, no substantial right of privacy was offended.

 (3) *General search*. There was no general exploratory search for evidence of guilt. The agents testified that they confined their initial search to locating occupants of the room or indications of their identity and possible location, and there is nothing to question the agents' good faith. Only the pictures were taken. "The search in the present case was * * * properly limited to and incident to the purpose of the officers' entry." People v. Gilbert, supra, 63 Cal.2d 690, 47 Cal.Rptr. 909, 408 P.2d at 375. See also Harris v. United States, 331 U.S. 145, 153, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947); United States v. Lefkowitz, 285 U.S. 452, 465–466, 52 S.Ct. 420, 76 L.Ed. 877 (1932); United States v. Guido, 251 F.2d 1, 4 (7th Cir. 1958); Matthews v. Correa, 135 F.2d 534, 537 (2d Cir. 1943).

 (4) *Property*. There was undoubtedly an interference with appellant's property right in the photographs. Although this rationale for the rule figures prominently in Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), and Gouled v. United States, 255 U.S. 298 (1921), even these early opinions recognize that the owner's right to undisturbed possession of his property must sometimes give way to an overriding social interest. The pressing public interest in the speedy identification and pursuit of the escaping murderers far outweighed the slight inconvenience appellant might have sustained from the temporary invasion of his possessory in-

12. See, e. g., Note, 54 Geo.L.J. 593, 595–600 (1966); Comment, 20 U.Chi.L.Rev. 319, 322–30 (1953); Note, 59 Nw.U.L. Rev. 611, 624–28 (1964); Note, 43 Ore.L. Rev. 333 (1964); Comment, 28 Chi.L. Rev. 664, 692–98 (1961); Manwaring, 16 Stan.L.Rev. 318, 327–28 (1964); Shellow, 48 Marquette L.Rev. 172 (1964); Kaplan, 49 Calif.L.Rev. 474, 477–78 (1961). See also Hayden v. Warden, 363 F.2d 647 (4th Cir. 1966).

terest in his property. Cf. Caldwell v. United States, 338 F.2d 385, 387 (8th Cir. 1964); see also Restatement (Second), Torts § 265, comment e.

We conclude that the photograph was properly seized.

DUNIWAY, Circuit Judge.

Judge BARNES and I concur in the foregoing portion of the opinion of Judge BROWNING, to whom the preparation of the opinion in this case was assigned. We are unable, however, to concur in his views as to the other questions presented on this appeal. As to those questions, our opinion is as follows:

## II.

B. *The Lineup.*

Gilbert claims that the court should have suppressed the testimony of eleven witnesses who identified him as a participant in the four robberies. He asserts that each identified him at a police lineup and that his being required to participate violated rights guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments. However, no mention of the Fourteenth was made at the trial.

Here is what the record shows. The government presented the testimony of fourteen persons, each an eyewitness to one of the offenses with which Gilbert was charged. Each one identified Gilbert, in the courtroom, as one of the robbers. Each then described the particular robbery that the witness had seen, in some detail, including Gilbert's participation in it. No objection was made, no motion to suppress the testimony of the witness was made either before trial, or before or at the time the witness testified. No request was made that the witness be first examined on voir dire, or out of the presence of the jury, to lay a foundation for the contention that Gilbert now makes.

On cross examination, twelve of the witnesses were asked if they had identified Gilbert at a police lineup. One did not. The other eleven did. Gilbert and his counsel then obtained from some of these witnesses a description of what happened at the lineup. In some instances, the government, on re-direct, brought out further evidence on the subject, primarily to emphasize that the men in the lineup were identified only by number, not by name. None of the evidence thus elicited was made the basis of an objection, a motion to suppress, a request for a hearing out of the presence of the jury, or anything else before the witness was excused.

After all of these eleven witnesses had testified and been excused, Gilbert made the motion set out in the margin.[13]

---

13. "THE DEFENDANT: And your Honor, one other brief motion. The defendant would move at this time that he was a federal prisoner March 26, 1964, when he was taken on a police line-up by United States Marshals without benefit of counsel.
"THE COURT: This is March of '64?
"THE DEFENDANT: Yes.
"THE COURT: The line-up there has been much testimony about?
"THE DEFENDANT: Yes. He was taken there without benefit of counsel and at the time he was taken he informed the marshals he did not want to attend and demanded counsel, and he was taken anyway. It is in violation of the Fifth and Sixth Amendments, your Honor, and the defendant asks all witnesses who attended this March 26 line-up and identified him, that their testimony be suppressed. It violates the self-incriminating clause of the Fifth, and the assistance of counsel of the Sixth.
"THE COURT: Well, that issue hasn't been—we are not involved in that issue at this time. Your statement as to what happened, of course, is not sufficient.
"THE DEFENDANT: Well, your Honor, then the defendant will move for a hearing on it.
"THE COURT: What about it, Mr. O'Connell?
"MR. O'CONNELL: Your Honor, it would seem to me, in any event, just looking at someone is not self-incrimination. In other words, you can look at someone.
"Secondly, we didn't bring out the part about the line-ups at all or the photographs, either, for that matter. It was

We think that Gilbert's motion was insufficient, that it came too late, and that we are therefore not required to consider the contentions that he now makes. Judge Browning, however, would not only consider them but also make them a basis for a reversal of the judgment. We disagree, and state our views as to their merits.

It was stipulated that Gilbert did not have counsel present at the lineup. Neither did the government. We assume, for the purpose of considering the matter, that, as Gilbert asserts, he informed the marshals that he did not want to attend and demanded counsel, and he was taken to the lineup anyway. The lineup occurred on March 26, 1964, after Gilbert had been indicted and had obtained counsel. It was held in an auditorium used for that purpose by the Los Angeles police. Some ten to thirteen prisoners were placed on a lighted stage. The witnesses were assembled in a darkened portion of the room, facing the stage and separated from it by a screen. They could see the prisoners but could not be seen by them. State and federal officers were also present and one of them acted as "moderator" of the proceedings.

Each man in the lineup was identified by number, but not by name. Each man was required to step forward into a marked circle, to turn, presenting both profiles as well as a face and back view, to walk, to put on or take off certain articles of clothing. When a man's number was called and he was directed to step into the circle, he was asked certain questions: where he was picked up, whether he owned a car, whether, when arrested, he was armed, where he lived. Each was also asked to repeat certain phrases, both in a loud and in a soft voice, phrases that witnesses to the crimes had heard the robbers use: "Freeze, this is a stickup; this is a holdup; empty your cash drawer; this is a heist; don't anybody move."

Either while the men were on the stage, or after they were taken from it, it is not clear which, the assembled witnesses were asked if there were any that they would like to see again, and told that if they had doubts, now was the time to resolve them. Several gave the numbers of men they wanted to see, including Gilbert's. While the other prisoners were no longer present, Gilbert and 2 or 3 others were again put through a similar procedure. Some of the witnesses asked that a particular prisoner say a particular phrase, or walk a particular way. After the lineup, the witnesses talked to each other; it is not clear that they did so during the lineup. They did, however, in each other's presence, call out the numbers of men they could identify.

■ *FIFTH AMENDMENT*

"* * * nor shall any person * * * be compelled in any criminal case to be a witness against himself * * *."
United States Const., Amendment 5.

---

Mr. Gilbert that has kept raising that throughout the trial.

"THE COURT: I don't recall whether in the first instance, whether the Government brought it out or not.

"MR. O'CONNELL: No sir, we did not bring it out at any time. It was always the defendant that brought out the lineups and the photographs.

"THE COURT: I know, at least, as to the majority of them. I don't know whether as to the beginning there was any question or not.

"MR. O'CONNELL: No, sir.

"THE DEFENDANT: Your Honor, it was brought out naturally because—we would like a hearing on it—

"THE COURT: No, there will be no hearing on it, Mr. Gilbert. If you could point out to me that the Government brought it out, in the first instance, then I would reconsider it, but the motion will be denied.

"THE DEFENDANT: If the record should indicate, your Honor, the Government raised it first, is that your ruling, there would be a hearing on it?

"THE COURT: I said if you can point out to me the Government did raise it first—I will have to check my notes on it—why, I might reconsider it.

"THE DEFENDANT: Then one thing, your Honor, for the record. In answer to Mr. O'Connell that he saw no harm in a person being looked at in a line-up, there was considerably more than that at the line-up."

Gilbert does not assert that he was asked any incriminating questions, much less that he gave any incriminating answers, during the lineup. His contention is that his being required to participate in the lineup violated his privilege against self-incrimination because it compelled him to furnish evidence against himself. The evidence so furnished was himself, his voice, and his movements. We hold that his fifth amendment privilege was not violated.

■ It has long been the view of the courts and of leading commentators that the privilege is limited to incriminating communications. Mr. Justice Holmes, speaking for the Court in Holt v. United States, 1910, 218 U.S. 245, 252–253, 31 S.Ct. 2, 6, 54 L.Ed. 1021, stated the principle as follows:

"Another objection is based upon an extravagant extension of the 5th Amendment. A question arose as to whether a blouse belonged to the prisoner. A witness testified that the prisoner put it on and it fitted him. It is objected that he did this under the same duress that made his statements inadmissible, and that it should be excluded for the same reasons. But the prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material. The objection in principle would forbid a jury to look at a prisoner and compare his features with a photograph in proof." [14]

Wigmore agrees:

" * * * the privilege is limited to testimonial disclosures. It was directed at the employment of legal process to extract from the person's own lips an admission of guilt, which would thus take the place of other evidence." 8 Wigmore, Evidence § 2263 (McNaughton rev. ed. 1961.) [15]

The most recent pronouncement by the Supreme Court, in Schmerber v. State of California, 1966, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 is to the same effect.[16] And every federal court that has passed upon the question so far as we can discover, has taken the same position. See, e. g., United States ex rel. Stovall v. Denno, 2 Cir., 1966, 355 F.2d 731, 734–738; Rigney v. Hendrick, 3 Cir., 1965, 355 F.2d 710, 713–714; Kennedy v. United States, D.C.Cir., 1965, 353 F.2d 462, 466; Copeland v. United States, D.C.Cir., 1964, 343 F.2d 287, 290; Caldwell v. United States, 8 Cir., 1964, 338 F.2d 385; Smith v. United States, 1963, 117 U.S. App.D.C. 1, 324 F.2d 879, 882; United States v. Iacullo, 7 Cir., 1955, 226 F.2d 788, 793; Smith v. United States, D.C. Cir., 1950, 187 F.2d 192, 198–99; Swingle v. United States, 10 Cir., 1945, 151 F.2d 512, 513; McFarland v. United States, 1945, 80 U.S.App.D.C. 196, 150 F.2d 593, 594. There is much state authority to the same effect, e. g., State v. Fisher, Ore., 1966, 410 P.2d 216, 217; People v. Graves, Cal., 1966, 49 Cal.Rptr. 386, 411 P.2d 114, 115–116; People v. Gilbert, Cal., 1965, 63 Cal.2d 690, 47 Cal.Rptr. 909, 408 P.2d 365, 376–377 cert. granted, 1966, 384 U.S. 985, 86 S.Ct. 1902, 16 L.Ed. 2d 1003; People v. Lopez, Cal., 1963, 32 Cal.Rptr. 424, 384 P.2d 16, 27–28.

■ The foregoing cases involve such matters as police lineups, Rigney v. Hendrick, supra, Williams v. United States, supra, Copeland v. United States, supra, Caldwell v. United States, supra, People v. Gilbert, supra, People v. Lopez, supra,

14. This was dictum because, under Adams v. People of State of New York, 1904, 192 U.S. 585, 598, 24 S.Ct. 372, 48 L.Ed. 575, the evidence would then have been admissible anyway. This is no longer the rule, Weeks v. United States, 1914, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652.

15. No doubt there can be communication that does not come from the lips, as when one nods or shakes his head in response to a question, or speaks in sign language, or writes rather than speaks. Cf. Mr. Justice Brennan's discussion in Schmerber v. State of California, 1966, 384 U.S. 757, 763–764, 86 S.Ct. 1826, 16 L.Ed.2d 908.

16. The holding in Schmerber is reinforced by the dissent of Mr. Justice Black, which rejects the Wigmore formulation.

including requiring the suspect to speak, not to elicit information but for voice identification, Rigney v. Hendrick, supra, People v. Lopez, supra, confrontation of the suspect by the victim at the time of arrest for purposes of identification, Kennedy v. United States, supra, similar confrontation at the police station, Smith v. United States, 187 F.2d, supra, or at a hospital to which the victim had been taken, United States ex rel. Stovall v. Denno, supra, or in court, Swingle v. United States, supra, fingerprints and palm prints, Smith v. United States, D.C. Cir., 324 F.2d, supra. United States v. Iacullo, supra, exemplars of handwriting, State v. Fisher, supra, People v. Graves, supra, examination of one's body to find blood on it, McFarland v. United States, supra, and the taking of a blood sample, Schmerber v. State of California, supra. They also make it clear that it is permissible to require that the suspect put on or take off clothing, move, assume certain poses, or speak, as Gilbert was required to do. Because one's voice is as much a physical characteristic as the color of his eyes, we reject the notion, advanced by some authorities,[17] that requiring the suspect to speak, where doing so does not involve communicating what he knows, violates his privilege.

### SIXTH AMENDMENT

"In all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defense." United States Const., Amendment 6.

Gilbert would have us extrapolate from certain decisions of the Supreme Court a rule that he had a right to consult counsel before being required to participate in the lineup, and to have the assistance of counsel during the lineup. He deduces from this rule a further result, that when these claimed rights are denied, no witness who was present at the lineup may give identifying testimony against him at his trial. We reject both the purported rule and the claimed result. The cases from which the purported rule is extracted fall into two categories. One group of cases calls the Sixth Amendment to the aid of the Fifth when the police seek information from the suspect who is in custody or on bail. Massiah v. United States, 1964, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246; Escobedo v. State of Illinois, 1964, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977; Miranda v. State of Arizona, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. The foregoing statement relates to the factual situations in these cases. The legal theories that they apply vary somewhat.

In *Massiah*, an indicted federal defendant who had a lawyer was arraigned, pled not guilty, and was released on bail. A codefendant, posing as a friend but actually cooperating with the government, obtained incriminating statements from him. These were admitted at his trial. The Supreme Court reversed. Before the Supreme Court, Massiah relied upon the Fourth Amendment's prohibition of unreasonable search and seizure, and upon the Fifth and Sixth Amendments. The Court said that it did not reach the Fourth Amendment claim. It did not say that it was relying only on the Sixth. It speaks of the right to counsel and says that a defendant is "as much entitled to such aid [of counsel] during that period" (from arraignment until the beginning of trial) "as at the trial itself." [18] (P. 205, 84 S.Ct. at p. 1202)

---

17. See Maguire, Evidence of Guilt 31 (1959), Weintraub, 10 Vand.L.Rev. 485, 505 (1957). The only case brought to our attention where a conviction was reversed because of voice identification, Palmer v. Peyton, 4 Cir., 1966, 359 F.2d 199, is not based upon fifth amendment grounds, but upon the due process clause of the fourteenth amendment. The court strongly disapproved of the method used. We might agree, but we doubt if the matter was of constitutional dimension. We would have thought that, like the claim that a witness lied, the question would be one for the jury to resolve. The court there thought that a lineup would have been the right procedure to use. (P. 201.)

18. This language was taken from the opinion in Powell v. State of Alabama, 1932, 287 U.S. 45, 57, 53 S.Ct. 55, 77 L.Ed. 158.

Its holding is twice stated, first at p. 206, 84 S.Ct. at p. 1203:

"We hold that the petitioner was denied the basic protections of that [Sixth Amendment] guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel."

The second statement is at p. 207, 84 S.Ct. at p. 1203:

"All that we hold is that the defendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against *him* at his trial."

We note that, in both statements, there is emphasis upon "his own incriminating statements." These phrases certainly point to the Fifth Amendment. The Court limited its holding to the obtaining of such evidence. It also said (p. 207, 84 S.Ct. at p. 1203):

"We do not question that in this case, as in many cases, it was entirely proper to continue an investigation of the suspected criminal activities of the defendant and his alleged confederates, even though the defendant had already been indicted."

However one reads the *Massiah* case, it certainly is not a ruling upon the type of case now before us.

*Escobedo*, likewise, does not deal with such a case as this one. There, the police had a suspect in custody and questioned him until he confessed. In doing so, they disregarded his request to see his lawyer, and the lawyer's request to see him. Relying upon *Massiah*, the Court held that the confession should have been excluded. It based its decision on the Sixth Amendment right to counsel. (See particularly, 378 U.S. at 484–488, 84 S.Ct. 1758.) But it also tied that right, in the context of the case, to the Fifth Amendment privilege against self-incrimination.

"The fact that many confessions are obtained during this period points up its critical nature as a 'stage when legal aid and advice' are surely needed. Massiah v. United States, supra, at 204, 84 S.Ct. at 1202; Hamilton v. [State of] Alabama, supra; [19] White v. [State of] Maryland, supra.[20] The right to counsel would indeed be hollow if it began at a period when few confessions were obtained. There is necessarily a direct relationship between the importance of a stage to the police in their quest for a confession and the criticalness of that stage to the accused in his need for legal advice. Our Constitution, unlike some others, strikes the balance in favor of the right of the accused to be advised by his lawyer of his privilege against self-incrimination. See Note, 73 Yale L.J. 1000, 1048–1051 (1964).

"We have learned the lesson of history, ancient and modern, that a system of criminal law enforcement which comes to depend on the 'confession' will, in the long run, be less reliable and more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation." (Id. at 488–489, 84 S.Ct. at 1764.)

And it summarizes its holding as follows:

"We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the

19. 1961, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed. 2d 114.

20. 1963, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193.

Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' Gideon v. Wainwright, 372 U.S. [335], at 342 83 S.Ct. [792,] at 795 [9 L.Ed.2d 799] and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." (Id. at 490–491, 84 S.Ct. at 1765.)

Again, there is emphasis upon "eliciting incriminating statements." We note, too, that the Court distinguished Crooker v. State of California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448, because

"In that case the Court merely rejected the absolute rule sought by petitioner, that 'every state denial of a request to contact counsel [is] an infringement of the constitutional right *without regard to the circumstances of the case.*' Id., 357 U.S., at 440, 78 S.Ct. at 1292. (Emphasis in original.)"

We also note that the Court limited its holding:

"Nothing we have said today affects the powers of the police to investigate 'an unsolved crime,' Spano v. People of State of New York, 360 U.S. 315, 327, 79 S.Ct. 1202, 1209, 3 L.Ed.2d 1265 (Stewart, J., concurring), by gathering information from witnesses and by other 'proper investigative efforts.' Haynes v. [State of] Washington, 373 U.S. 503, 519, 83 S.Ct. 1336, 1346, 10 L.Ed.2d 513. We hold only that when the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession—our adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer." (Id. at 492, 84 S.Ct. at 1766.)

*Miranda,* a group of four cases, is basically an explanation and extension of the *Escobedo* holding. (See 384 U.S. at 441–442, 86 S.Ct. 1602.) In *Miranda,* the Court said of *Escobedo:*

"That case was but an explication of basic rights that are enshrined in our Constitution—that 'No person * * * shall be compelled in any criminal case

to be a witness against himself,' and that 'the accused shall * * * have the Assistance of Counsel'—rights which were put in jeopardy in that case through official overbearing." (Id. at 442, 86 S.Ct. at 1611.)

There then follows a brief discussion of the history and purpose of the privilege against self-incrimination, and a summary statement of the holding:

"Our holding will be spelled out with some specificity in the pages which follow but briefly stated it is this: the prosecution may not use statements, whether exculpatory or inculpatory stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." (Id. at 444, 86 S.Ct. at 1612.)

The entire opinion deals explicitly with statements obtained from the accused. It does not relate in any way to the type of case now before us. The only reference to police lineups appears at p. 453, 86 S.Ct. 1602, and deals with the misuse of a lineup to trick the accused into confessions, not with the use of a lineup for purposes of identification. And the discussion of the law, in part II of the opinion, deals primarily with the Fifth Amendment. Speaking of *Escobedo,* the Court said:

"A different phase of the *Escobedo* decision was significant in its attention to the absence of counsel during the questioning. There, as in the cases today, we sought a protective device to dispel the compelling atmosphere of the interrogation. In *Escobedo,* however, the police did not relieve the defendant of the anxieties which they had created in the interrogation rooms. Rather, they denied his request for the assistance of counsel, 378 U.S. at 481, 488, 491, 84 S.Ct. at 1760, 1763, 1765. This heightened his dilemma, and made his later statements the product of this compulsion. Cf. Haynes v. State of Washington, 373 U.S. 503, 514, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513 (1963). The denial of the defendant's request

for his attorney thus undermined his ability to exercise the privilege—to remain silent if he chose or to speak without any intimidation, blatant or subtle. The presence of counsel, in all the cases before us today, would be the adequate protective device necessary to make the process of police interrogation conform to the dictates of the privilege. His presence would insure that statements made in the government-established atmosphere are not the product of compulsion." (Id. at 465–466, 86 S.Ct. at 1623.)

Moreover, part III of the opinion makes it clear that the right to consult counsel, and the right to have counsel present, are to protect the Fifth Amendment privilege:

"The circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators. Therefore, the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system we delineate today." (P. 469, 86 S.Ct. p. 1625.)

\* \* \* \* \* \*

"Even preliminary advice given to the accused by his own attorney can be swiftly overcome by the secret interrogation process. Cf. Escobedo v. State of Illinois, 378 U.S. 478, 485, n. 5, 84 S.Ct. 1758, 1762. Thus, the need for counsel to protect the Fifth Amendment privilege comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel present during any questioning if the defendant so desires." (P. 470, 86 S.Ct. p. 1625.)

\* \* \* \* \* \*

"The financial ability of the individual has no relationship to the scope of the rights involved here. The privilege against self-incrimination secured by the Constitution applies to all individuals. The need for counsel in order to protect the privilege exists for the indigent as well as the affluent. In fact, were we to limit these constitu-

tional rights to those who can retain an attorney, our decisions today would be of little significance." (P. 472, 86 S.Ct. p. 1626.)

Once again, the Court limited its holding:

"Our decision is not intended to hamper the traditional function of police officers in investigating crime. See Escobedo v. State of Illinois, 378 U.S. 478, 492, 84 S.Ct. 1758, 1765, 12 L.Ed. 2d 977. When an individual is in custody on probable cause, the police may, of course, seek out evidence in the field to be used at trial against him." (P. 477, 86 S.Ct. p. 1629.)

\* \* \* \* \* \*

"As we have noted, our decision does not in any way preclude police from carrying out their traditional investigatory functions." (P. 481, 86 S.Ct. p. 1631.)

We think it clear that the foregoing cases do not require a holding that Gilbert had a right to consult counsel before being placed in a lineup, or to the presence of counsel at a lineup.

The other cases relied upon are White v. State of Maryland, 1963, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 and Hamilton v. State of Alabama, 1961, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114. These cases, we think, are not remotely in point. In *Hamilton*, the Court held that a defendant had a Sixth Amendment right to counsel at an Alabama preliminary hearing, because such a hearing is, in that state, "a critical stage in a criminal proceeding." (P. 53, 82 S.Ct. p. 158.) In Alabama, the defense of insanity must then be pleaded, pleas in abatement must then be made, and motions to quash based upon defects in the drawing of a grand jury must then be made; otherwise, these rights are lost. The Court held that, at such a hearing, the defendant has a right to counsel. *White* is similar. It holds that White had a right to counsel at his Maryland preliminary hearing. There White, not represented by counsel, pleaded guilty at such a hearing. Later, upon arraignment, he pled not guilty. As his trial, the guilty plea

was used against him. The Court held that White's preliminary hearing was a "critical stage." Both of these cases dealt with proceedings of a formal nature, before a judge or magistrate, at which an ignorant defendant could (and in *White*, did) lose, through ignorance, rights that a lawyer could protect. Of course the defendant should have had counsel in those cases. But their relation to this case is, to say the least, difficult to discern. It is quite true that, unlike the first group of cases, they do not expressly involve the Fifth Amendment.[21] It is equally true that they do not lay down a rule that would require counsel at a police lineup. They merely require that a defendant have (or waive) counsel at a proceeding at which he loses rights that counsel could have protected. No doubt that is why they were cited in *Massiah* and in *Escobedo*, which applied their rationale to the pre-trial loss of Fifth Amendment rights.

More pertinent than any of the foregoing cases, we think, is Schmerber v. State of California, 1966, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908. There a defendant, arrested for drunken driving, was compelled despite his refusal to do so on advice of counsel to give a sample of his blood to be tested for alcoholic content. After rejecting his Fifth Amendment claim, the Court turned to his Sixth Amendment right to counsel claim, and disposed of it as follows:

"Since petitioner was not entitled to assert the privilege, he has no greater right because counsel erroneously advised him that he could assert it. His claim is strictly limited to the failure of the police to respect his wish, reinforced by counsel's advice, to be left inviolate. No issue of counsel's ability to assist petitioner in respect of any rights he did possess is presented. The limited claim thus made must be rejected." (P. 766, 86 S.Ct. p. 1833)

But it is asserted that here counsel could have assisted Gilbert by advising Gilbert not to participate, or seeing to it that the lineup was fairly conducted. This, however, begs the question left open by *Schmerber*, which is, could counsel have assisted him "in respect of any rights he did possess?" To answer this question in the affirmative would be to say that Gilbert and his counsel, not the police, had the right to decide whether a lineup or some other identification procedure should be held at all, and if it be held, how and under what circumstances.

With one exception, the authorities to date are clear that these are not "rights [Gilbert] did possess."

"There is no law or decision which says that a man, free or incarcerated, has a constitutional right not to be observed and possibly identified as the perpetrator of a crime even though no formal charges have been made."

Rigney v. Hendrick, 3 Cir., 1965, 355 F.2d 710, 712.

"The absence of counsel at the time of the confrontation at the scene of the crime did not deprive Appellant of a right to silence, a right to withhold evidence or any other right which could have been effectively asserted had counsel been present."

Kennedy v. United States, D.C.Cir., 1965, 353 F.2d 462, 466.

"If Stovall had had counsel, what could counsel have done to thwart the identification? He could not have demanded Stovall's immediate release so that no one might see him. He could not have arranged to have Stovall continuously wear a hood or mask over his face to avoid identification, nor could he have ordered the police forthwith to halt their identification activities. Counsel would not have said 'Cease further efforts at identification: Stovall has admitted his guilt' because Stovall had not done so.

"Again adverting to the opinion in Kennedy, supra, counsel could not have prevented the hospital room identification because 'An accused has no right

---

21. In *White*, the defendant, without advice of counsel, incriminated himself by his guilty plea, and his doing so is what made the proceeding "critical" as to him.

to be viewed in a line-up rather than singly.' Here, as in Kennedy, counsel could not 'have altered the course of events' as to identification, and since no confession or 'any other evidence respecting which counsel could have rightfully advised Appellant to refuse to yield' was obtained, there was no deprivation of Sixth Amendment rights."

United States ex rel. Stovall v. Denno, 2 Cir., 1966, 355 F.2d 731, 739.

The exception is Wade v. United States, 5 Cir., 1966, 358 F.2d 557. *Wade* is a two to one decision. Judge Tuttle wrote the majority opinion; Judge Jones dissented. The casting vote was by Judge Waterman of the Second Circuit, who was one of the three dissenters in United States ex rel. Stovall v. Denno, supra. The decision simply follows the dissent in that case. We decline to follow it.

 The same arguments as to assistance that counsel might render could also be made as to the taking and analysis of blood samples (Schmerber v. State of California, supra), the taking and comparison of fingerprints (Smith v. United States, D.C.Cir., 1963, 324 F.2d 879), the obtaining and comparison of handwriting exemplars (State v. Fisher, Ore., 1966, 410 P.2d 216; People v. Graves, Cal., 1966, 49 Cal.Rptr. 386, 411 P.2d 114), and to many other investigative procedures. As to each of these activities, and others like them, it can be argued that matters of judgment and proper procedure can vitally affect the result. Why, then, should not defense counsel, accompanied if necessary by experts, participate in all of them, from beginning to end, to see that acceptable, fair procedures are used, scientific standards are maintained, and only the very best evidence is thus developed? One answer, we would think, lies in the need for expedition. Another is the disruptive effect upon investigators who would have opposing counsel breathing down their necks. We are inclined to doubt that once it began to appear that the evidence was likely to point to the guilt of the ac-

cused, his counsel's participation would be constructive. Another is that a criminal trial is not supposed to be a sporting contest. We conduct it as an adversary proceeding. But that does not mean that everything done by the state, preparatory to trial, for the purpose of proving or disproving guilt, is suspect as sloppy or biased or fraudulent.

 Society has a legitimate interest in convicting the guilty, just as it has in seeing that the innocent are not tried or convicted, and in seeing that a person who is tried is tried fairly. See Williams v. United States, 1965, 120 U.S.App.D.C. 244, 345 F.2d 733, 736, separate opinion of Burger, J. Scientific crime detection plays a part in serving all of these interests. So does the police lineup. The defendant's protection against errors or mistakes lies in full exposure of the facts at trial, through cross-examination and the presentation of contrary evidence, and in the impartiality and good sense of the judge and jury.

No doubt it will be said that all that we are concerned with is a lineup; that a lineup differs from the other investigatory activities that we have mentioned in that they are "scientific" while a lineup is not, that the lineup involves the active participation of the accused, and that we should await another day to talk about matters not now before us. But the difference is one of degree. And there is at least one reason applicable to the lineup, but not to the other activities mentioned, that further justifies holding that the state, not the defendant or his counsel, should continue to control it. The purpose of a lineup is to permit witnesses to the crime, often the victims, to identify the criminal. It is still unfortunately true, in this country at least, that in many cases witnesses need protection from intimidation and worse.

It is said that English practice demonstrates that the presence of counsel at a lineup is helpful, and that in one American city, Philadelphia, when the police hold a lineup they notify the suspect's attorney and permit him to be present. (See Rigney v. Hendricks, 3 Cir., 1965,

355 F.2d 710, 712.) These practices are illuminating,[22] but that does not require that they be elevated into constitutional rights.

■ Opinions may well differ as to whether a better procedure could have been followed at Gilbert's lineup. Thus it is claimed that the assembling of the witnesses in the same auditorium, and permitting them to communicate with each other, was calculated to produce a consensus at the expense of individual judgment. The assumption seems to be that this is unfair. Not necessarily. Our own experience indicates the contrary; very often, in trying to recall some past event or fact, we find it helpful to discuss the matter with others who were present. Recollection by concensus may be more accurate than that by individual judgment. Whether that was so here would, we think, be for the jury to decide, not for defense counsel to have a right to decide before or during the lineup.

The testimony of witnesses who identify the defendant at a lineup can be as devastating to a defendant at trial as that of witnesses who testify to the results of fingerprints or handwriting comparison, or the chemical analysis of body fluids. In that sense, it can be said that such testimony may "make the trial no more than an appeal" from the investigative activities of the police. (The quotation is from *Escobedo*, 378 U.S. at 487, 84 S.Ct. at 1763). It can equally be said that the use of such testimony may critically affect the outcome of the trial. (Cf. *Hamilton* and *White*, supra.) But thus to use *Escobedo* or *Hamilton* or *White*, as Gilbert would have us do, and as the court did in *Wade*, supra, is to put those decisions to a use never contemplated. We refer again to the limiting language of the Court's opinions in *Massiah*, *Escobedo* and *Miranda*, quoted above. And see the comments of Judge Burger in Kennedy v. United States, D.C. Cir., 1965, 353 F.2d 462, 464–466 and Williams v. United States, 1965, 120 U.S. App.D.C. 244, 345 F.2d 733, 734–736 (separate opinion).

■ We cannot find support in any of the opinions of the Supreme Court for so broad a rule as is now pressed upon us, that the Sixth Amendment requires that the right to counsel be extended to all confrontations between the state and the accused during the course of a prosecution which may critically affect the outcome. Such a notion is flatly rejected in Schmerber v. State of California, supra. We have difficulty in imagining a "confrontation" that could more "critically affect the outcome" than the one that occurred in *Schmerber*. Moreover, the basic "confrontation" at a lineup was not between the state and the accused; it was between the accused and eyewitnesses to the crime, including his victims.

We are aware, as is Judge Friendly, of "the Supreme Court's new concept that the right to the assistance of counsel embraces activities outside the courtroom." (United States ex rel. Stovall v. Denno, supra, dissenting opinion at p. 743, n. 3.) Such an awareness, however, does not answer the question here posed, namely, what activities outside the courtroom does the right embrace? We doubt that Judge Friendly means *all* such activities; *Schmerber* shows the error of such a view. Other courts have rejected Sixth Amendment claims similar to those made by Gilbert. United States ex rel. Stovall v. Denno, supra, 355 F.2d at 739 (en banc,

---

22. So far as appears, in Philadelphia the attorney is not permitted to participate, by way of advice or otherwise; he is simply permitted to attend. In England, he takes an active part—sometimes, apparently, an obstructive one. See Napley Problems of Effecting the Presentation of the Case for the Defendant, 66 Colum. L.Rev. 94, 98, 99 (1966). From the examples there given by a defense counsel, we find it arguable that counsel's partic-

ipation does not, at least in some cases, contribute to search for the truth. As the author there says: "The primary duty of the Solicitor must be to his client and not the public, however much his sympathies may extend toward the latter." We do not criticize this as a statement of counsel's duty. But it does raise doubts in our minds about raising the English practice to the status of a constitutional right.

6–3 decision); Kennedy v. United States, supra, D.C., 353 F.2d at 464–466; Williams v. United States, supra; State v. Fisher, supra, 410 P.2d at 216, 217; People v. Graves, supra, 411 P.2d at 115–116; People v. Gilbert, supra, 408 P.2d at 376, cert. granted, 384 U.S. 985, 86 S.Ct. 1902, 16 L.Ed.2d 1003 (involving the same lineup as is here involved); People v. Lopez, supra, 384 P.2d at 26–27. We also reject them.

■■■ Let it now be assumed, however, that we are wrong, and that Gilbert did have a right to counsel at the lineup. What effect should the failure to honor the right have upon the availability of the testimony of the witnesses at trial? Gilbert would have us hold that they should not be permitted to testify at all. The *Wade* case seems to agree. We cannot accept such a view. The concept of a tainted *witness*, as distinguished from tainted *evidence*, is to us a novel one. So far as we can discover, no court except the *Wade* court has yet embraced it. The courts have excluded that part of the testimony of a witness that describes what he saw or heard on an occasion when his seeing or hearing was in violation of a constitutional right of the accused. See Wong Sun v. United States, 1963, 371 U.S. 471, 485, 83 S.Ct. 407, 9 L.Ed.2d 441. And under the "fruit of the poisonous tree" doctrine (Nardone v. United States, 1939, 308 U.S. 338, 339, 341, 60 S.Ct. 266, 84 L.Ed. 307) other evidence obtained by means of the unconstitutional activity has also been excluded. But, as is pointed out in *Nardone*, "If knowledge of them [the facts] is gained from an independent source they may be proved like any others." [23] (P. 341, 60 S.Ct. p. 268.) Here, every witness who was at the lineup had knowledge gained from an independent source. Each had actually seen one of the robberies and had seen Gilbert participating in it. Each identified him in the courtroom. Each such identification necessarily harked back to what the witness saw at the scene of the crime. The accuracy of the recollection of the witness

may or may not have been bolstered or shaken during the lineup proceeding. But surely the knowledge gained from the independent source, at the scene of the crime, remained. We reject the idea that the witnesses should not have been permitted to testify at all because they participated in the lineup.

What actually happened in Gilbert's case was that the government did not rely at all upon the identification that the witnesses made at the lineup. They simply described the crime and identified Gilbert in the courtroom. It was Gilbert who brought out the facts regarding the lineup during the cross-examination of the witnesses. On the basis of the evidence so elicited, he moved to suppress all of their testimony. The trial court denied the motion solely on the ground that the government did not rely upon or offer testimony as to the lineup identification. In this, we think that the court was correct.

It is urged that, if the courtroom identification rests wholly or substantially upon the unlawful lineup identification, it should be excluded as fruit of the poisonous tree, and the court should have held a hearing to determine whether that is so. But, in the first place, the courtroom identification can never rest "wholly" upon the lineup. By definition, the witness is one who saw the criminal at another time in connection with the crime. In identifying the accused at the lineup, he is necessarily relying upon knowledge independently and legally acquired, knowledge that he had before he went to the lineup, and, when he testifies in court, he is necessarily also using such independently acquired knowledge. The most that the lineup can be said to do is to afford an opportunity to focus the witness' attention upon the suspect, and to enable the witness to relate his knowledge about the criminal to the man who stands before him. It may be that his inner conviction as to the accuracy of that knowledge will, in some cases, be strengthened by his par-

---

23. The language was taken from Silver-thorne Lumber Co. v. United States, 1920, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319.

ticipation in the lineup. If there is any way in which the degree to which that is so can be measured and decided at the hearing suggested, we do not know what it is. The human mind is not a series of separate compartments of knowledge. Pretending that it is may enable a court to think that it is effectively carrying out a constitutional duty. But we can hardly conceive of a more futile or unrealistic exercise in judicial fact finding.

As the Court of Appeals for the District of Columbia said, in Smith v. United States, 1963, 117 U.S.App.D.C. 1, 324 F.2d 879, 881–882:

"But a witness is not an inanimate object which like contraband narcotics, a pistol or stolen goods, 'speak for themselves.' The proffer of a living witness is not to be mechanically equated with the proffer of inanimate evidentiary objects illegally seized. The fact that the name of a potential witness is disclosed to police is of no evidentiary significance, per se, since the living witness is an individual human personality whose attributes of will, perception, memory and volition interact to determine what testimony he will give. The uniqueness of this human process distinguishes the evidentiary character of a witness from the relative immutability of inanimate evidence."

There the police had learned the name of an eye witness to the crime from a suspect during a period of illegal detention. At trial, defendant sought to exclude his testimony as "fruit of the poisonous tree." The Court of Appeals held that the trial judge was right in refusing to do so.

More closely in point is Payne v. United States, 1961, 111 U.S.App.D.C. 94, 294 F.2d 723. There, the victim of a crime identified Payne as its perpetrator. This was done during a lineup which was claimed to have been held in violation of the rule in Mallory v. United States, 1957, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479.

"As to the identification, the trial judge allowed Warren to identify Payne as he sat in the courtroom, but did not permit any reference to the identification made at police headquarters. Whether this last restriction was necessary under Mallory we need not say. However, it narrows the issue before us." (294 F.2d at 726.)

The court rejected the "fruit of the poisonous tree" doctrine as applied to such a case.

"The consequence of accepting appellant's contention in the present situation would be that Warren would be forever precluded from testifying against Payne in court, merely because he had complied with the request of the police that he come to police headquarters and had there identified Payne as the robber. Such a result is unthinkable. The suppression of the testimony of the complaining witness is not the right way to control the conduct of the police, or to advance the administration of justice. The rights of the accused in a case like the present are adequately protected when the complaining witness takes the stand in open court, for examination and cross-examination. Cf. Frisbie v. Collins, 1952, 342 U.S. 519, 522, 72 S.Ct. 509, 96 L.Ed. 541." (Id. at 727.)

What Judge Washington there said is, we think, both eminently sensible and fully applicable here. See also to the same effect, Jacobson v. United States, 8 Cir., 1966, 356 F.2d 685; Williams v. United States, 1965, 120 U.S.App.D.C. 244, 345 F.2d 733; Edwards v. United States, 1964, 117 U.S.App.D.C. 383, 330 F.2d 849.[24]

---

**24.** In *Jacobson* it was contended that the testimony of a police officer as to Jacobson's identity should have been excluded because he viewed Jacobson during an unlawful detention. The trial court then held a hearing, at which the officer testified that he could identify Jacobson without relying on the identification at the jail. He was then permitted to testify, but not about the jail identification. The conviction was affirmed. The court relied on Payne v. United States, supra, and Smith v. United States, supra, rather than upon the trial court's hearing. The "fact

■ In Gilbert's case, the government did exactly what Judge Friendly said it should do in United States ex rel. Stovall v. Denno, supra, 2 Cir., 355 F.2d at 745:

"The self-created dilemma of the concurring opinion, that exclusion of the hospital identification would prevent identification at the trial, is illusory; exclusion of the former would simply have required the prosecutor to rest on Mrs. Behrendt's memory of the night of the dreadful crime and on her courtroom identification. If, in this posture, defense counsel had brought out the hospital identification, as no experienced counsel would, he would have had only himself to blame."

Gilbert had the right to, and did, bring out on cross-examination the facts as to the lineup. From this he could argue that the lineup was unfair, that but for the lineup the witnesses would have been unable to identify him at trial, and that therefore they should not be believed. This is the most that he was entitled to, even assuming that the lineup procedure violated his Sixth Amendment rights.

*FOURTEENTH AMENDMENT*

"No State shall * * * deny to any person within its jurisdiction the equal protection of the laws." United States Const., Amendment 14, Section 1.

■ Gilbert asserts that he was denied equal protection of the laws because he was in jail and could thus be placed in a lineup, while if he had been able to make bail, he could not be. This theory was considered at length, and rejected, by the Court of Appeals for the Third Circuit in Rigney v. Hendrick, 1965, 355 F.2d 710, 714–715. We agree with the views there expressed.

### III.

■ Gilbert urges that certain admissions that he made to an F.B.I. agent should have been excluded because they were involuntary.[25] A motion to suppress was made, and oral testimony was taken. There were two interviews, on March 17 and March 20, 1964. The government, however, offered only statements made by Gilbert on March 20. The court denied the motion. Gilbert does not contend that the evidence does not support the court's ruling.[26] He makes a narrower point. At the March 17 interview Gilbert asked whether he could make a "deal" whereby, if he were to confess, the members of his family—his mother, brother, and wife—would not be bothered.

finding" consisted of accepting the officer's testimony as to the nature of his recollection. How can a court possibly judge the accuracy of such testimony? How substantial must the effect of the "illegal" identification be upon the trial testimony of the witness? We do not see how that question can be answered.

25. Escobedo v. State of Illinois, 1964, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, is here applicable; Miranda v. State of Arizona, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, is not. Johnson v. State of New Jersey, 1966, 384 U.S. 719, 86 S. Ct. 1772, 16 L.Ed.2d 882. Gilbert's trial began on August 17, 1964.

26. Our own review of the testimony convinces us that a contrary ruling would have been clearly erroneous. If a record can ever demonstrate the voluntariness of a confession, this one does. If ever a defendant knew his rights, and was fully prepared to make the most of them, Gilbert was that defendant. At the March 17 interview he was given the full warning now required by Miranda v. State of Arizona, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. He expressed admiration both for the Alhambra, California and Philadelphia, Pennsylvania police because they had treated him so correctly. He had hoped that they would beat him, as he thought that such a beating would help him. At the March 17 interview, Gilbert made only one admission, that he had been seen by a witness in a car after one of the robberies. This was not offered at the trial. Otherwise, when asked about the bank robberies, he said he wanted to talk to his attorney and that after that he might "clean all those jobs up." He asked to see the F.B.I. agent on March 20, and, when he met with the agent, told him that he had talked to his attorney, who had told him "to go ahead and discuss these bank robberies." He then admitted the robberies. No deal was discussed, much less offered. Gilbert, at the hearing, testified to the contrary, but the court expressly believed the agent and disbelieved Gilbert.

It was only after Gilbert offered the deal that there was discussion about his family. They were under investigation for possible violation of the "harboring" and "receiving" statute. He urges that this proposal, which he initiated—and which the agent flatly declined—so infected or influenced what happened at the next interview, on March 20, as to render what was said involuntary or inadmissible on some other theory, not clearly defined, and that the trial judge refused to consider whether what happened on March 20 was so influenced by what happened on March 17 that the March 20 confession should be excluded.

The record (the pertinent portions are set out in the margin),[27] simply does not bear out these contentions. The court ruled that the March 20 statements were voluntary. We think that to isolate statements made by the trial judge, to the effect that he would not rule on the voluntariness of the statements of March 17, and to conclude on that basis that he also refused to consider the bearing, if any, of the March 17 interview upon the March 20 statements, is unfair to the trial judge and is an improper attempt to create error where none exists. The government had stated that it did not intend to bring the earlier statements in, and there was no need for an express holding on their admissibility. But the record, read as a whole, does clearly show that what happened at the March 17 interview was considered when the court ruled on the March 20 statements. More than that we cannot, should not, and do not demand.

### IV.

Gilbert says that evidence as to his having committed another offense, with which he was not charged and for which he had not been convicted, was improperly introduced against him.[28] Consideration of this contention requires some exposition of the record. One of the banks that Gilbert was accused of robbing was a branch of the Security First National Bank at 174th and Crenshaw, Los Angeles (Torrance), on or about Decem-

27. "THE COURT: No. I have listened to this testimony very carefully and I have to conclude that the statements of the 20th were voluntary, because there was ample time—Mr. Gilbert talked to his attorney.

"He said he didn't talk to him about this, but he told Mr. LaJaunesse that he had talked to him and the attorney told him it was appropriate to admit to these robberies that were involved in here, not the one in Alhambra. I can't but conclude it was a voluntary admission.

"He said he didn't have counsel but he wanted to proceed. There is no question of not having counsel. I am not satisfied that there was any kind of deal at all. That is, I don't think there was. I think what Mr. LaJeunesse says I believe, there wasn't any deal made, if he pled guilty that they would drop any further investigation for anything further at all with respect to his family

"THE DEFENDANT: *Your Honor, it would be the defendant's position that whatever was said on the 20th was induced by the conversation of the 17th.*

"THE COURT: *I understand that, but in the meantime you had talked to your attorney."* (Emphasis added.)

The court then declined to rule upon the voluntariness of the admission of March 17, because the government was not going to use it. The following then occurred:

"THE DEFENDANT: I understand that. I am asking the Court that the Court rule the 17th, any admissions there are inadmissible, or both dates, that anything said was voluntary [sic], whatever was said.

"THE COURT: I am ruling that what was said on the 20th was voluntarily said.

"THE DEFENDANT: Then the Court isn't ruling on the 17th?

"THE COURT: I am not ruling on it. I am not saying whether or not because it is not going to be an issue because they are only going to rely on the 20th."

28. Ordinarily, the introduction of such evidence is held to be both erroneous and prejudicial. Thurman v. United States, 9 Cir., 1963, 316 F.2d 205; Ramirez v. United States, 9 Cir., 1961, 294 F.2d 277, 284; Enriquez v. United States, 9 Cir., 1961, 293 F.2d 788, 794; Mitrovich v. United States, 9 Cir., 1926, 15 F.2d 163, 164; see also Marshall v. United States, 1959, 360 U.S. 310, 79 S.Ct. 1171, 3 L. Ed.2d 1250; Abdul v. United States, 9 Cir., 1958, 254 F.2d 292, 295; Bloch v. United States, 9 Cir., 1955, 221 F.2d 786, 790; Allen v. United States, 9 Cir., 1902, 115 F. 3, 11–12.

ber 6, 1963. Gilbert called as a witness one Goslaw, who testified that he had a savings account in that bank in 1963, opened by him in July or August and closed about a month later. Gilbert, he said, accompanied him when he opened the account. He also was accompanied by Gilbert when he went to the bank at various later times. He made the visits appear quite innocent. On cross-examination, Goslaw admitted that he had been convicted of five felonies, including a March 2, 1964 conviction of armed robbery of a bank. He testified that on the occasions when he and Gilbert visited the bank, Gilbert did not display a gun, did not point it at a teller, and did not jump the counter and take money from the cash drawers.

Gilbert took the stand on his own behalf. He stated that he knew what "casing a robbery" meant, and that he had been in the Torrance Security First National Bank before December 6, 1963, and saw where the vault was, where the tellers' windows were, and that there were no armed guards. He went there a number of times. The following then occurred:

"Q. And in fact, the gentleman that went with you to the bank, Mr. Goslaw, was a crime partner of yours, was he not, sir?

"A. No, sir.

"Q. In fact, the two of you had robbed another Security First National Bank in Culver City, had you not?

"A. No, sir.

MR. WEEDMAN: Objection, your Honor, I think it is highly improper for counsel to inject something like that, unless he is now in a position to prove it.

MR. O'CONNELL: Your Honor, I am in a position to show that Mr. Gilbert admitted that he had robbed the Security First National Bank in Culver City with Mr. Goslaw.

MR. WEEDMAN: Well, I am going to certainly object to that, your Honor. If counsel is going to offer this as part of his case in chief, then he had an opportunity to do so * * *."

* * * * * *

"He is now attempting to sandbag, if you will, the defendant with this kind of very loose allegation with respect to what Mr. Gilbert supposedly said at some time.

"We have no evidence of such a conference, such a conversation. We have no evidence as to what led to it. It is very improper and I will certainly object to it.

"THE COURT: Goslaw testified, of course, since the direct examination. You shouldn't, as counsel for the Goverment knows, be getting into matters which you are not in a position to show by asking questions.

"Mr. O'CONNELL: Your Honor, I am in a position, I will represent that.

"THE COURT: All right.

"MR. O'CONNELL: I was not going to bring it out, except Mr. Gilbert put Mr. Goslaw on and therefore I can show the connection and the interest between them.

"THE COURT: Yes, I think you are entitled to do that.

"MR. WEEDMAN: Is counsel making an offer of proof that Mr. Goslaw participated in the robbery of this particular bank?

"MR. O'CONNELL: No, this Security First National here I am not. I am stating that Mr. Gilbert stated to Mr. LaJeunesse that he and Mr. Goslaw participated in the robbery of the Security First National Bank at Culver City, and that was the bank that Mr. Goslaw has already testified he pleaded guilty to.

"THE COURT: All right. Objection overruled."

* * * * * *

"Q. Did you rob the Security First National Bank of Culver City in company with Mr. Goslaw?

"A. No, sir, I did not."

On rebuttal, the government called F.B.I. Agent LaJeunesse. He testified that the

following occurred at the March 20 interview of Gilbert:

"Q. Now, Mr. LaJeunesse, I don't want to repeat what you have testified to earlier in the trial, but Mr. Gilbert testified that he could not remember any statements about .45 caliber automatic.

Let me refer to the robbery—was the robbery of the Security First National Bank in Torrance, California, on December 6, 1963, discussed?

"A. Yes.

"Q. What did Mr. Gilbert say to that?

"A. He told me he had participated in the robbery and that he had carried a .45 caliber automatic while he was committing the robbery.

"Q. Now, was the robbery of the Huntington Park First Savings and Loan Association in South Gate, California, on Tweedy Boulevard, on December 20, 1953, discussed?

"A. Yes, sir, it was.

"Q. And what was the conversation concerning that?

"A. Again admitting robbing that bank and again admitted having carried a .45 caliber automatic.

"Q. Was the robbery of the United California Bank in Long Beach, California, on December 23, 1963, discussed?

"A. Yes, sir.

"Q. And what was that discussion?

"A. Again admitted that robbery and again admitted he carried a .45 caliber automatic.

"Q. Was the robbery of the Home Savings and Loan Association in Highland Park on December 31st, 1963, discussed?

"A. Yes.

"Q. What was that conversation?

"A. He admitted that robbery and again he carried a .45.

"Q. In addition, was there any discussion about the robbery of the Security First National Bank in Culver City, California, on October 28, 1963, Mr. LaJeunesse?

"A. Yes.

"Q. Would you relate that, please, Mr. LaJeunesse?

"A. He admitted he had participated in that robbery and with him was Ralph Goslaw, and they had utilized a tan or beige-colored Oldsmobile, which they had stolen for the purpose of a getaway car. After the robbery they abandoned the car and drove off from the switch spot in a truck, which he, Gilbert, had previously rented from a lot in Long Beach under the name of George Swenson.

Following the robbery he returned the truck to that lot and I asked him again about a weapon and again he used a .45.

"Q. Was there any discussion about the amount of money that had been taken in that robbery?

"A. I believe there was, yes. I didn't have the exact amount with me at that time and I don't—

"MR. O'CONNELL: I have no further questions."

The first four institutions are those named in the indictment. The last is the one mentioned in the cross-examination of Goslaw. On cross-examination, Gilbert's attorney asked LaJeunesse the following questions:

"Q. Did the defendant tell you he had taken $4600.00 from a bank in Culver City?

"A. May I refresh my—

"Q. Yes.

"A. Yes, he did.

"Q. How much was taken from that bank—withdraw that.

As a matter of fact, it was only approximately $2200.00 that was taken at that bank, isn't that so?

"A. I can't tell you right now how much was taken, I don't recall.

"Q. Have you any record there that might help you in that regard?

"A. Perhaps Mr. O'Connell—I don't believe I have any here, no, on the Culver City robbery.

\* \* \* \* \* \*

"Q. You were asked by the Assistant U.S. Attorney a moment ago if you believed Mr. Gilbert's statements to you concerning these various robberies and I believe your answer was yes, you did believe him.

As part of his conversations with you he said that he had with another robbed a bank in Culver City, that is correct, is it?

"A. Yes, sir.

"Q. Your investigation concluded that Mr. Gilbert had nothing to do whatever with the Culver City bank robbery isn't that true?

"A. No, that is not true.

"Q. Has he been indicted for that Culver City robbery?

"A. Not to my knowledge.

"Q. Do you have any witnesses who say Mr. Gilbert was a party to that bank robbery?

"A. Was that witness or witnesses?

"Q. Witnesses.

"A. There is one I know of that has identified him and perhaps more.

"THE COURT: We are not going to get into the problem of the Culver City bank robbery.

"MR. WEEDMAN: Yes. Very well, your Honor."

The foregoing is the entire record relating to this subject matter. Gilbert's counsel's objection was hardly an adequate one; throughout, it is tied to the government's ability to prove the charge. When government counsel stated what he was prepared to prove, Gilbert's counsel said no more. The balance of the testimony came in without objection. We doubt that Gilbert is now in a position to complain, even though the government does not rely upon the inadequacy of the objection.

The government argues that the cross-examination of Goslaw was proper, to show the true nature of the relation between him and Gilbert. Goslaw's testimony had made Gilbert's visit to the Torrance branch appear quite innocent. The government sought to give it a different cast by the questions asked Goslaw about those visits. This was followed up in the questioning of Gilbert and by the testimony of LaJeunesse. We think that if Goslaw had participated in the Torrance branch robbery, with which Gilbert was charged, the government could have brought out that fact, by questioning either of them (Gilbert having taken the stand) in order to weaken the effect of Goslaw's testimony. We also think that it was proper to do the same thing, and for the same purpose, in relation to the robbery of the Culver City branch, where as here, it was a similar and closely contemporaneous robbery. The fact that Goslaw and Gilbert were in "business" together was material, Gilbert having, in effect, vouched for Goslaw by offering him as a witness. The fact that the "business" was bank robbery does not make the testimony inadmissible. While the procedure followed by the government was unusual, we do not think that, under the peculiar facts, it was erroneous. Cf. Greatreaks v. United States, 9 Cir., 1954, 211 F.2d 674.

If we assume that, in this case, the evidence should have been excluded, we do not think that the error was serious enough to require a reversal. We do not deal here with evidence unconstitutionally obtained, as to which the Supreme Court has laid down a rather strict rule. (See Fahy v. State of Connecticut, 1963, 375 U.S. 85, 86–87, 84 S.Ct. 229, 11 L.Ed. 2d 171.) Here, we deal with Rule 52(a) of the Federal Rules of Criminal Procedure: "Any error \* \* \* which does not affect substantial rights shall be disregarded." There was no objection to the testimony of LaJeunesse; Gilbert's counsel carried the inquiry even further. The government did not mention the matter in argument. Gilbert did. No limiting instruction was asked; no objection to

instructions was made. The court told the jury "The defendant is not on trial for any act or conduct not alleged in the indictment." And the evidence of guilt in this case was overwhelming. See Bushaw v. United States, 9 Cir., 1965, 353 F.2d 477, 481; Baker v. United States, 9 Cir., 1963, 310 F.2d 924, 929–930; Cellino v. United States, 9 Cir., 1960, 276 F.2d 941.

Affirmed.

BARNES, Circuit Judge.

I concur in Parts I and IIA of Judge Browning's foregoing opinion, and in Parts IIB, III and IV of Judge Duniway's opinion, and I dissent to Judge Browning's dissenting opinion as to Parts IIB, III and IV.

BROWNING, Circuit Judge (dissenting).

The following was originally prepared as the concluding portion of the opinion of the court. It was not agreed to by the other members of the panel for reasons stated in the opinion of Judge Duniway. It therefore states a dissenting view.

II.B. *The Lineup*

All but three of the fourteen witnesses who identified appellant in the courtroom testified on cross-examination that they had also identified him at a pretrial lineup. Appellant sought to suppress their courtroom identification on the ground that the lineup violated appellant's Fifth Amendment right against compulsory self-incrimination and his Sixth Amendment right to counsel.

The circumstances surrounding the lineup, so far as they appear in this record, are as follows. The lineup was held on March 26, 1964, subsequent to the return of both indictments, and after appellant had retained counsel. Appellant objected to participating and demanded the aid of his counsel. Appellant's protests were ignored and he was required to participate in his counsel's absence.[1]

Approximately thirteen men, including appellant, appeared on stage. The prisoners were identified by number. They were required to approach the center of the stage individually, turn, try on various articles of clothing, and answer questions, including whether they owned an automobile, where they were arrested, and whether when arrested they were armed. They were required to say certain phrases used during the robberies— "Freeze, this is a stick up"; "This is a holdup"; "This is a heist"; "Don't anyone move"; "Empty your cash drawer"— to shout these phrases and repeat them in a quiet voice, while standing still and while walking, both normally and at a rapid pace.

Witnesses from all four robberies were assembled in the audience. After each prisoner went through the general routine, the FBI agent in charge asked if the witnesses wished to see any of the prisoners again. The witnesses were instructed to call out the numbers of any prisoner they recognized, and told that if they had doubts, this was the time to see the prisoners a second time, and to ask them to repeat phrases used in their respective robberies. The witnesses called out the numbers of two or three of the prisoners, including appellant, many of them calling out appellant's number. The prisoners thus selected were asked by various witnesses to repeat given phrases, walk in a particular way, or try on particular articles of clothing. Appellant was asked to speak loudly, to walk rapidly and slowly while repeating certain phrases, to speak more loudly (which one witness testified appellant refused to do), and to put on a hat (which two of the witnesses testified he at first refused to do). The witnesses talked among themselves as the lineup progressed.

*Fifth Amendment.* Requiring a prisoner to expose himself to view in a lineup does not, per se, violate the privilege against self-incrimination.[2] But as

---

1. We assume these to be the facts for the present purpose, since appellant offered at trial to prove them if given the opportunity to do so.

2. See, e. g., Wade v. United States, 358 F.2d 557 (5th Cir. 1966); United States ex rel. Stovall v. Denno, 355 F.2d 731, 735–738 (2d Cir. 1966); Rigney v. Hen-

Chief Judge Tuttle recently pointed out in Wade v. United States, 358 F.2d 557 (5th Cir. 1966), when Justice Holmes formulated the distinction between compelled communication (which is prohibited) and compelled exposure of the body (which is not), he expressly reserved the question of "how far a court would go in compelling a man to exhibit himself," in view of the Fifth Amendment stricture against self-incrimination, Holt v. United States, 218 U.S. 245, 253, 31 S.Ct. 2, 54 L.Ed. 1021 (1910).[3] Eminent authority suggests that compelling the accused to produce a voice exemplar may in itself constitute prohibited self-incrimination. Maguire, Evidence of Guilt 31 (1959); Weintraub, 10 Vand.L.Rev. 485, 504–05 (1957).[4] And it has been recently held that the due process clause of the Fourteenth Amendment precludes a state from relying upon a pretrial voice identification "secured by a process in which the search for truth is made secondary to the quest for a conviction." Palmer v. Peyton, 359 F.2d 199 (4th Cir. 1966). See also United States ex rel. Stovall v. Denno, 355 F.2d 731, 738 (2d Cir. 1966). But the question of possible Fifth Amendment violation need not be pursued, for in any event, in the writer's view, appellant was denied his Sixth Amendment right to counsel.

*Sixth Amendment.* Since appellant was indicted prior to the lineup, the prosecution against him was unquestionably underway. The rationale of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), White v. State of Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963), Hamilton v. State of Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961), required that appellant receive the aid of counsel in all confrontations with the prosecutor which might critically affect the prosecution's outcome, including confrontations which occurred outside the courtroom. Escobedo v. State of Illinois, supra; Massiah

---

drick, 355 F.2d 710, 713–714 (3d Cir. 1965); Caldwell v. United States, 338 F. 2d 385, 389 (8th Cir. 1964). But see Justice Clark's comment in Estes v. State of Texas, 381 U.S. 532, 549, 85 S.Ct. 1628, 1636, 14 L.Ed.2d 543 (1964), that courtroom television "is a form of mental—if not physical—harassment, resembling a police line-up or the third degree."

3. *Holt* held that the constitutional issue need not be decided since the federal courts were not required to exclude evidence even if unconstitutionally obtained—a doctrine subsequently rejected in Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

4. The problem is not necessarily resolved by the Supreme Court's recent holding "that the privilege protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature * * *" Schmerber v. State of California, 384 U.S. at 761, 86 S.Ct. at 1830, 16 L.Ed.2d 908 (1966). The Court went on to state "the protection of the privilege reaches an accused's communications, whatever form they might take, and the compulsion of responses which are also communications" (384 U.S. at 763, 764, 86 S.Ct. at 1832), and noted

that this includes "acts on the part of the person to whom the privilege applies," as well as his words (384 U.S. at 761, 86 S.Ct. at 1830). The Weintraub article, cited by the Court p. 7 n. 8, suggests that voice exemplars are testimonial or communicative because the accused represents that he is speaking in his normal voice. 10 Vand.L.Rev. at 505.

See generally 2 Wharton, Crim.Evidence, § 659 at 560 (12th ed. 1955); Annot., Requiring Suspect or Defendant in Criminal Case to Demonstrate Voice for Purposes of Identification, 16 A.L.R. 2d 1322 (1951); 8 Wigmore, Evidence § 2265, at 395–97 (McNaughton rev. 1961); McCormick, Evidence § 126 (1954); Inbau, Self-Incrimination 49–51 (1950); Comment, 24 Ind.L.J. 587 (1949). The issue was reserved in United States ex rel. Stovall v. Denno, 355 F.2d 731, 735 n. 2 (2d Cir. 1966). For authorities on related questions see Annot., Requiring Defendant in Criminal Case to Exhibit Self, or Perform Physical Acts, During Trial and in Presence of Jury, 171 A.L.R. 1144 (1947); Annot., Pretrial Requirement that Suspect or Accused Wear or Try on Particular Apparel as Violating his Constitutional Rights, 18 A.L.R.2d 796 (1951).

v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).[5]

What takes place during the lineup might lay the foundation for conviction as surely as responses to extra-judicial interrogation. It might, just as clearly, reduce to mere form the right to have guilt or innocence determined at a public trial before a judge in an orderly courtroom, protected by the procedural safeguards of the law, and effectively assisted by counsel. See Massiah v. United States, 377 U.S. 201, 204, 84 S.Ct. 1199 (1963).[6] The results of the lineup, like those of an interrogation, might well "make the trial no more than an appeal" from the prior uncounseled confrontation between appellant and the prosecution. Escobedo v. State of Illinois, 378 U.S. at 487, 84 S.Ct. 1758, 12 L.Ed.2d 977. Since the lineup might critically affect the outcome of the trial, appellant was entitled to counsel's aid. Wade v. United States, 358 F.2d 557 (5th Cir. 1966).[7]

But it is said that counsel could be of no assistance to an accused at a lineup;

and that to require the presence of counsel would be an empty formality. I cannot agree, either generally or with respect to this appellant.

An accused needs counsel's advice in deciding whether to participate' in the lineup at all, and, if he does participate, whether to condition his participation upon the prosecutor's agreement to arrangements which would assure a fairer proceeding and a more reliable result— for example, by affording defense counsel a prior opportunity to question the identification witnesses, by selecting participants in the lineup who are not grossly dissimilar from the accused in physical appearance, and by fairly conducting the lineup itself. An illuminating discussion of some of the factors which counsel would be required to weigh in advising the accused in this connection appears in a recent paper by David Napley, Solicitor of the Supreme Court of Judicature of England and Wales, where the right of the accused to assistance of counsel at "identification parades" is recognized.[8]

5. The teaching of *Escobedo* with respect to right to counsel under the Sixth Amendment is not affected by the Court's decision in Miranda v. State of Arizona, 384 U.S. 436, 465, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Speaking of *Escobedo* the Court said (n. 35): "The police also prevented the attorney from consulting with his client. Independent of any other constitutional proscription, this action constitutes a violation of the Sixth Amendment right to the assistance of counsel and excludes any statement obtained in its wake."

6. *Cf.* Turner v. State of Louisiana, 379 U.S. 466, 473, 85 S.Ct. 546 (1965) ; Rideau v. State of Louisiana, 373 U.S. 723, 726– 727, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). See Note, 79 Harv.L.Rev. 935, 1014 (1966).

7. Compare United States ex rel. Stovall v. Denno, 355 F.2d 731 (2d Cir. 1966) (pre-indictment confrontation by victim); Kennedy v. United States, 353 F.2d 462 (D.C. Cir. 1965) (same) ; Williams v. United States, 120 U.S.App.D.C. 244, 345 F.2d 733 (1965) (pre-indictment lineup).
 What occurs during pretrial interrogation of witnesses by the police or the

prosecutor may also critically affect the outcome of the prosecution, but such occasions do not involve a confrontation between the accused and the state.

8. "During the early stages of criminal proceedings, or, more generally, before they are instituted, a Solicitor may be instructed by a suspect either to advise whether he should attend an identification parade or to accompany him when he does attend. Identification parades, it may be thought, are an unsatisfactory means for pursuing the ends of justice. In the vast preponderance of cases the witness will have brought the suspect under suspicion as a result of inspecting photographs of convicted persons maintained at the Criminal Record Office or by a provincial police force. In the parade, the witness tends to identify the subject of the photograph rather than the person he saw when the crime was committed. Secondly, while many identification parades are conducted by the police with a scrupulous regard for fairness, it is not unknown for the identifying witness to be placed in a position where he can see the suspect before the parade forms; there is little opportunity for the attending Solicitor to know whether this has occurred or not. Final-

If the accused decides to participate, counsel's mere presence during the lineup proceeding will afford protection against abuses which a secret lineup could only encourage.[9] Moreover, counsel could advise the accused whether to accede to particular demands for verbal responses and physical movements. He could appeal to the prosecutor to eliminate unfair procedures at the moment of their appearance, and, if need be, could seek the aid of a protective court order.[10] In short, the presence of counsel at the lineup would serve to preserve the benefits which we attribute to our accusatorial, adversary system of justice.[11]

ly, since even the innocent suspect is aware that he alone is on risk, he is likely to become agitated and apprehensive that he might be identified, and thus tends to stand out from his companions like a sore thumb.

"On balance, therefore, it often seems wise to advise against participation in the parade. On the other hand, it should be borne in mind that often no satisfactory alternative offers itself, that the police have a duty to catch criminals and secure their conviction and that, if he remains unidentified on the parade, the suspect is relieved from the anxiety of suspicion. Too often, however, such parades are little more than fishing expeditions; then the danger becomes the more intense and, as a result, the writer, to the surprise of presiding police officers and the dismay of the Solicitors Department at Scotland Yard, requires that he be informed as to the description previously given by the identifying witness, and if necessary to question him upon it. If the description appears fairly to bring the suspect under suspicion and he, after due warning as to the risks, continues to assert his innocence, he is advised to consent to the parade. If, however, the description is so inadequate as to negative reasonable suspicion, or if his guilt is not beyond question, he must be advised against participation in the parade. The primary duty of the Solicitor must be to his client and not the public, however much his sympathies may extend towards the latter." Napley, Problems of Effecting the Presentations of the Case for the Defendant, 66 Colum.L.Rev. 94, 98–99 (1966).

9. As the Supreme Court said in Miranda v. State of Arizona, 384 U.S. 436, 470, 86 S.Ct. 1602, 1626 (1966), with respect to the functions of counsel at in-custody police interrogation: "If the accused decides to talk to his interrogators, the assistance of counsel can mitigate the dangers of untrustworthiness. With a lawyer present the likelihood that the police will practice coercion is reduced, and if coercion is nevertheless exercised the lawyer can testify to it in court."

In the course of the same opinion the Court described one lineup abuse which the presence of counsel would prevent (384 U.S. at 453, 86 S.Ct. at 1617):

"The interrogators sometimes are instructed to. induce a confession out of trickery. The technique here is quite effective in crimes which require identification or which run in series. In the identification situation, the interrogator may take a break in his questioning to place the subject among a group of men in a lineup. The witness or complainant (previously coached, if necessary) studies the line-up and confidently points out the subject as the guilty party.' Then the questioning resumes 'as though there were now no doubt about the guilt of the subject.' A variation on this technique is called the 'reverse line-up':

'The accused is placed in a line-up, but this time he is identified by several fictitious witnesses or victims who associated him with different offenses. It is expected that the subject will become desperate and confess to the offense under investigation in order to escape from the false accusations.' "

10. As Judge Friendly recently said in response to "the rhetorical question as to what counsel could have done" in connection with a police-arranged confrontation between the victim of a crime and the accused (355 F.2d at 744) :

"He might have persuaded the prosecutor, in the state's own interest, if not to forego the hospital identification, at least to assure conditions better designed to avoid suggestion. He might have persuaded the judge to direct that Stovall be immediately sent to and then kept in jail pending trial, or be put before Mrs. Behrendt only under fair conditions such as a line-up, or be accompanied by counsel who might question her * * *. Or, as a last resort, he might have advised Stovall to refuse to go, or to remain silent if taken by force."

11. See Miranda v. State of Arizona, 384 U.S. 436, 465–466, 86 S.Ct. 1602 (1966) ; Escobedo v. Illinois, supra, 378 U.S. at 490 n. 13, 84 S.Ct. 1758, 12 L.Ed.2d 977 ; Note, 19 Rutgers L.Rev. 111, 134–37 (1964) ; Note, 25 Mont.L.Rev. 174, 178 (1963) ; Comment, 73 Yale L.J. 1000,

Turning to the present lineup, it is obvious even on this sparse record that counsel might have done much to guide appellant's conduct, and to assure a fairer proceeding. Appellant's need for assistance in deciding whether to condition his participation or refuse to participate at all was especially acute in view of the prior exposure to appellant's photographs of all the witnesses—several had examined pictures of appellant repeatedly over a period of months.[12] Similarly, the questions asked (particularly whether appellant was armed when arrested), and the nature of the demonstrations which appellant was required to perform raised problems as to which counsel could have been helpful. Finally, the practice of assembling all of the witnesses in the same auditorium, enabling them to communicate with each other freely and to inform each other of their impressions both directly and by calling out the number of the prisoner they recognized, was calculated to produce a consensus at the expense of individual judgment, and might well have been avoided, either at the request of counsel or in response to a protective order. Wade v. United States, 358 F.2d 557 (5th Cir. 1966). See United States ex rel. Stovall v. Denno, supra, 355 F.2d at 744 (Friendly, J., dissenting).

The Supreme Court of California has held that appellant was not entitled to counsel at the lineup, essentially on the grounds that his privilege against self-incrimination was not impaired, that he was required to do no more at a lineup than he might have been required to do at trial, and that counsel could have determined whether the lineup was fairly conducted by the use of pretrial discovery of prosecution witnesses and cross-examination at trial. People v. Gilbert, 47 Cal.Rptr. 909, 408 P.2d 365, 376–377 (1966).

But the right to counsel is not limited to situations in which the privilege against self-incrimination is at stake. Miranda v. State of Arizona, 384 U.S. 436, 465 n. 35, 86 S.Ct. 1602 (1966). Assistance of counsel is required for purposes other than that of advising the accused of his right to remain silent. Escobedo had been advised of that right (378 U.S. at 499, 84 S.Ct. 1758 (White, J., dissenting)), and the matters held to require the advice of counsel in Hamilton v. State of Alabama, 368 U.S. 52, 53–54, 82 S.Ct. 157 (1961), did not relate to the privilege against self-incrimination. See United States ex rel. Stovall v. Denno, supra, 355 F.2d at 743 (Friendly, J., dissenting). But see id. at 740 n. 1 (Lumbard, C. J., concurring.) As noted, the rationale of the Supreme Court decisions in this area is that preservation of the substance of the right to public trial with the assistance of coun-

---

1016, 1028, 1034, 1051 (1964). But see United States ex rel. Stovall v. Denno, 355 F.2d 731, 740 n. 1 (2d Cir. 1966) (Lumbard, C. J., concurring); Kennedy v. United States, 353 F.2d 462, 464–465 (D.C. Cir. 1965). In England counsel is available to accused at lineup as "absolutely essential in the interests of justice." Wall, Eye-Witness Identifications in Criminal Cases, p. 43 (1965).

It should be noted in passing that in at least one of our great metropolitan areas "[b]oth the suspect and his attorney are notified that he is to be placed in a lineup; the attorney is also given the opportunity to be present" (Rigney v. Hendrick, 355 F.2d 710, 712 (3d Cir. 1965)), with no suggestion that this recognition of the right to counsel has interfered with effective identification of offenders by police. See also Miranda v. State of Arizona, 384 U.S. 436, 483, 489, 86 S.Ct. 1602 (1966);

N.Y. Times, May 19, 1966, p. 44 M, col. 1: "The clear consensus at the 60th annual meeting of the National Association of Attorneys General was that the Supreme Court's ruling in Escobedo v. [State of] Illinois had had little or no effect on the obtaining of confessions. * * * Furthermore, Jack P. S. Gremillion, Attorney General of Louisiana and president of the association, said that even the presence of lawyers during interrogation had not 'hurt the confession rate a bit.' Mr. Gremillion said that ever since the Escobedo case lawyers in his state had been present in the back rooms of police stations. 'If the suspects haven't got the money we appoint lawyers for them, and it hasn't made a bit of difference as far as confessions go.' "

12. See note 8. See also Frank, Not Guilty 157–158.

sel requires that the right to counsel be extended to all confrontations between the state and the accused during the course of the prosecution which may critically affect the outcome.

Nor is it enough to say that an accused is required to do no more at lineup than he could be compelled to do at trial. At trial he has a lawyer. At counsel's request a judge might order the segregation of identification witnesses, and take other appropriate steps to enhance the fairness and reliability of the identification testimony.

Finally, even if California's pretrial criminal discovery system were available in federal courts, it could not be realistically contended that subsequent interrogation of the witnesses to a secret lineup would serve as a reasonable substitute for counsel's presence and participation in the proceeding itself. Even if what actually occurred could be accurately determined by these means, nothing could then be done to change it.

Since the lineup identifications of appellant were the product of illegal activity, they were not admissible in evidence, for "testimony as to matters observed during an unlawful invasion has been excluded in order to enforce the basic constitutional policies." Wong Sun v. United States, 371 U.S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963). However, the government did not offer proof of the lineup identifications. Testimony of the witnesses on direct examination was limited to identification of appellant as he sat in the courtroom.[13] Solely for the reason that the lineup identifications were not part of the government's case in chief, the district court denied appellant's motion to suppress.[14]

However, the fact that the government did not rely directly upon the lineup identifications was not a sufficient ground for denying appellant's motion. In order to make the deterrent effect of the exclusionary rule fully effective, it is extended "as well to the indirect as the direct products" of unconstitutional police activity. Wong Sun v. United States, supra, 371 U.S. at 484, 83 S.Ct. 407.

Although deterring violation of constitutional rights is a vital objective, it is also important that evidence relevant to the issue of guilt or innocence be freely received. In an effort to accommodate these conflicting interests the Supreme Court has limited the exclusionary rule. Evidence traceable to an unconstitutional search may nonetheless be received if the government shows it was or would have been obtained from an "independent source" (Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920) (dictum)), or if the connection between the search and the evidence is "so attenuated as to dissipate the taint." Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939) (dictum); Wong Sun v. United States, 371 U.S. 471, 485–487, 83 S.Ct. 407 (1963). See Maguire, 55 J.Crim.L. 307 (1964); Comment, 79 Harv.L.Rev. 938, 1024 (1966). Thus the question in the present case is whether the courtroom identifications were " 'come at by exploitation' of the unlawful lineup 'or instead by means sufficiently distinguishable to be purged of the primary taint.' " Wong Sun v. United States, supra, 371 U.S. at 488, 83 S.Ct. at 417 (quoting from Maguire, Evidence of Guilt 221).

There has been some suggestion that a courtroom identification can never be freed of the taint of prior illegal observation of the accused. Wade v. Unit-

---

13. The witnesses testified regarding the lineup identifications on cross-examination.

14. The government suggests that the motion to suppress was untimely because not made until all but one of the government's witnesses had completed their testimony.

The court undoubtedly had discretion to entertain the motion when made (cf. Fed. R.Crim.P. 41(e) ; Jones v. United States, 362 U.S. 257, 264, 80 S.Ct. 725, 4 L.Ed. 2d 697 (1960)), and indicated that it declined to do so only because the testimony regarding the lineup identification was not introduced by the government.

ed States, 358 F.2d 557 (5th Cir. 1966); United States ex rel. Stovall v. Denno, 355 F.2d 731, 742 (2d Cir. 1966) (Lumbard, C. J., concurring); Broeder, 42 Neb.L.Rev. 483, 534–35 (1963).[15] On the other hand, it has sometimes been assumed, from dictum in Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939), that the connection between the two is always to be treated as so attenuated as to render the courtroom identification admissible. United States ex rel. Stovall v. Denno, supra, 355 F.2d at 745 (Friendly, J., dissenting); Williams v. United States, 120 U.S.App.D.C. 244, 345 F.2d 733, 736 (1965) (Burger, J., concurring). Cf. Edwards v. United States, 117 U.S.App. D.C. 383, 330 F.2d 849, 851 (1964); Payne v. United States, 111 U.S.App. D.C. 94, 294 F.2d 723, 727 (D.C.Cir. 1961); Monroe v. United States, 98 U.S. App.D.C. 228, 234 F.2d 49, 56 (1956). See also Bernstein, 37 Ill.L.Rev. 99, 105 (1942).

Neither extreme accommodates the interests involved. If courtroom identifications are invariably admitted no matter how clearly it may appear that they rest wholly or substantially upon violation of constitutional right, the interest in deterrence is wholly ignored. On the other hand, if courtroom identifications by witnesses to illegal lineups are invariably excluded no matter how clearly it may appear that they rested upon the witnesses' observations at the scene of the crime and were not influenced by

viewing the accused at the lineup, the interest in receiving relevant evidence is sacrificed with too little cause.

As in other situations in which evidence is challenged as tainted by an illegal activity, a reasonable accommodation between the conflicting interests requires the trial judge to determine whether in light of all the circumstances a substantial relationship exists between the illegal activity and the challenged testimony. See generally Maguire, 55 J.Crim.L. 307 (1964). If a substantial relationship is found, then the government may have benefited from its wrongful conduct, and the interest in deterrence requires exclusion of the courtroom identification. If the relationship is remote or tenuous, the interest in furthering the search for truth must prevail. Thus in Jacobson v. United States, 356 F.2d 685 (8th Cir. 1966), when objection was made to testimony of the witness Peterson, identifying the accused, on the ground that the courtroom identification was based upon observation of the accused by Peterson during a period of illegal detention, "A hearing was held in the absence of the jury, at which Peterson testified positively that he was able to identify appellant as the same person he saw in Williams on December 18, 1963 without regard to having seen appellant in the jail on November 10, 1964. The court then overruled the motion to suppress, but excluded the officer's testimony by excluding any reference to the so-called 'jailhouse identification.'" 356 F.2d at 687.[16]

---

15. See also IV Wigmore § 1130, at 208 (3d ed. 1940):
> "Ordinarily, when a witness is asked to *identify* the assailant, or thief, or other person who is the subject of his testimony, the witness' act of pointing out the accused (or other person), then and there in the courtroom, is of little testimonial force. After all that has intervened, it would seldom happen that the witness would not have come to believe in the person's identity. The failure to recognize would tell for the accused; but the affirmative recognition might mean little against him."

See also Frank, Not Guilty 148–50, 157–58 (1957).

16. As the *Jacobson* case demonstrates, the fact that the proffered evidence is testimony rather than a tangible object does not alter the principle, but only requires that the intervention of human memory, will, and emotion be considered with other relevant circumstances. Wade v. United States, 358 F.2d 557 (5th Cir. 1966), and United States ex rel. Stovall v. Denno, 355 F.2d 731, 735, 741 (2d Cir. 1966) (Lumbard, C. J., concurring), also present relevant factual situations, but deal with the problem as one of determining whether admission of the courtroom identification was "harmless error" under the standard stated in Fahy v. State of Connecticut, 375

The burden rested upon the appellant to establish that the lineup was illegal and that there was a reasonable possibility that attendance of the witnesses at the lineup tainted their courtroom identifications. The burden would then pass to the government to convince the trial court that the evidence was free of taint. Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1940). Cf. Murphy v. Waterfront Comm'n, 378 U.S. 52, 79, n. 18, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964); Collins v. Beto, 348 F.2d 823, 827 (5th Cir. 1965); United States v. Tane, 329 F.2d 848, 853 (2d Cir. 1964); United States v. Paroutian, 299 F.2d 486, 489 (2d Cir. 1962); United States v. Coplon, 185 F.2d 629, 636 (2d Cir. 1950), cert. denied 342 U.S. 920, 72 S.Ct. 362, 96 L.Ed. 688 (1952); Goldstein v. United States, 120 F.2d 485, 488 (2d Cir. 1941), aff'd on other ground, 316 U.S. 114, 62 S.Ct. 1000, 86 L.Ed. 1312 (1942); Maguire, 55 J.Crim.L. 307, 309 (1964).

Appellant discharged his burden of demonstrating the illegality of the lineup. And the details of the lineup procedure which were disclosed, plus testimony of several of the witnesses that they did not identify appellant until the procedure was well advanced, may have been enough to establish the reasonable possibility that the courtroom identifications were in part the product of the lineup. On the other hand, the testimony of some of the witnesses indicated that their courtroom identifications reflected what they saw at the time of the particular robbery, unaffected by the intervening illegal lineup. But the trial judge did not decide the issue. Instead, he denied appellant's request for a hearing at which the facts necessary to a decision of the issue could have been developed. This was error.

### III

Appellant contends that admissions which he made to an FBI agent should not have been received in evidence because they were improperly induced.

After appellant had been indicted and while he was in custody, he was questioned on two occasions by an FBI agent. The admissions in question were made at the second interview.

The FBI agent opened the first interview, held on March 17, 1964, by advising appellant of his right to consult with counsel, and to refuse to give a statement. In reply, appellant informed the FBI agent that he had retained an attorney and that before making a statement he wished to have his attorney's advice. The FBI agent persevered, and the interview continued for nearly three hours. In the course of the interview the agent inquired about appellant's family, telling appellant that he was doing so for the purpose of determining whether they had harbored appellant while he was a fugitive from arrest [in violation of 18 U.S.C.A. § 1071], or had received money which appellant had stolen from a bank [in violation of 18 U.S.C.A. § 2113(c)]. The agent recalled that appellant replied, "I want to leave my family out of this. I have caused them enough trouble already." The agent responded, "Apparently you have." Appellant inquired, "What do you mean by that?" and the agent said, "Well, you know we talked to your mother." The agent then went on to tell appellant that his mother was ill, probably with cancer; that his brother's children were being abused by their schoolmates as a result of publicity concerning appellant; and that appellant's mother, brother, and sister-in-law were under investigation to

U.S. 85, 86–87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963). See also the following, involving related though somewhat different issues. Wong Sun v. United States, supra, 371 U.S. at 485–486, 491, 83 S.Ct. 407; Collins v. Beto, 348 F.2d 823, 835 (5th Cir. 1965) (Friendly, J., concurring); Smith v. United States, 344 F.2d 545 (D.

C. Cir. 1965); Edwards v. United States, 330 F.2d 849, 851–852 (D.C. Cir. 1964) (testimony of Berry); United States v. Tane, 329 F.2d 848, 853 (2d Cir. 1964); McLindon v. United States, 117 U.S.App. D.C. 283, 329 F.2d 238, 240–241 (1964); and Smith v. United States, 117 U.S.App. D.C. 1, 324 F.2d 879, 881–82 (1963).

determine whether they had violated the statutes referred to.

There was a discussion between appellant and the FBI agent regarding the possibility of a "deal" by which appellant would confess to the bank robberies in return for assurances that no further action would be taken against his family. The FBI agent stopped the questioning, left the room, telephoned an assistant United States Attorney, told him of the discussion, and asked whether the interview should continue in the absence of appellant's counsel. The FBI agent received no direct answer to this question, but was told to advise appellant that as of that time no process was outstanding against appellant's mother, brother, or sister-in-law. The FBI agent returned to the interview room and so advised appellant. Appellant told the FBI agent that he would talk with his attorney and contact the FBI agent later.

Near the close of this interview appellant made an admission with respect to one of the robberies, but this admission was not offered as evidence at the trial.

Appellant testified that he spoke to his attorney on March 18th or 19th, but the attorney declined to advise him on the ground that he represented appellant only as to a pending state charge, and not as to the federal charges. Having heard nothing further from his family, appellant decided to call the FBI agent.

On March 20th appellant telephoned the FBI agent and arranged to see him. The FBI agent again advised appellant of his rights. Appellant informed the FBI agent that appellant's attorney had told him to go ahead. The FBI agent read the list of robberies with which appellant was charged, and appellant admitted the four robberies involved here.

Appellant testified that the FBI agent stated, on both the 17th and the 20th, that although the agent could give no guarantee, he thought that if the robberies were cleared up there would be no reason to continue the investigation of appellant's family. Although readily admitting the discussion of appellant's family and of the possibility of a "deal" on the 17th, the FBI agent denied that either subject was mentioned on the 20th, or that a "deal" was in fact ever made.

The government offered the oral confession of the 20th in evidence. Appellant objected that it was not voluntarily made, but was induced by implied threats and promises with respect to the investigation and prosecution of his family. The trial court refused to determine whether the admission made on the 17th was voluntary. It held that any improper influence present on the 17th had been dissipated by the 20th because of the lapse of time, and the fact that appellant had consulted with counsel. The court credited the FBI agent's testimony that there was no discussion of a "deal" or of appellant's family on the latter date, and held that the oral confession made on that date was therefore voluntary.

The trial court erred in refusing to consider whether the interrogation of the 17th was so tainted by implied threats or inducements as to render inadmissible any confessions made on that date.[17] Had the trial court addressed itself to the problem, it could have concluded that what occurred on the 17th rendered ap-

---

17. Appellant does not rely upon the doctrine of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), apparently conceding that his right to counsel was waived.

For a discussion of the applicability of Canon 9, the Canons of Professional Ethics of the American Bar Association, see Broeder, Wong Sun v. United States: A Study in Faith and Hope, 42 Neb.L.Rev. 483, 599–604 (1963). See also Lee v.

United States, 322 F.2d 770, 777 (5th Cir. 1963); Ricks v. United States, 118 U.S. App.D.C. 216, 334 F.2d 964, 970 n. 18 (1964). The present case differs from that presented in United States v. Massiah, 307 F.2d 62, 66 (2d Cir. 1966), rev'd on other grounds 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), since at least from the time the agent telephoned the prosecuting attorney, the latter must be charged with responsibility for the continuation of the interview.

**960**

pellant's decision to incriminate himself something less than the voluntary choice of a free and unrestrained will. Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); Shotwell Mfg. Co. v. United States, 371 U.S. 341, 347–348, 83 S.Ct. 448, 9 L.Ed.2d 357 (1962). A threat or promise concerning one close to the accused in affection is often an element in a determination of inadmissibility [see, e. g., Lynumn v. State of Illinois, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963); Crawford v. United States, 219 F.2d 207, 210 n. 5 and text (5th Cir. 1955); cf. Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed. 2d 760 (1961)]—although this factor standing alone may not invariably compel that conclusion. See, e. g., Stein v. People of State of New York, 346 U.S. 156, 186, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953); United States v. Gordon, 303 F.2d 441 (5th Cir. 1962); see also Cortez v. United States, 337 F.2d 699–701–702 (9th Cir. 1964), and cases cited therein. Cases are collected in People of State of California v. Trout, 54 Cal.2d 576, 6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418.

Had the trial court examined the events of the 17th, and had it concluded that the interrogation was sufficiently tainted by implied threats or inducements to render appellant's self-incriminating statements inadmissible, a presumption would have arisen that those influences continued to the interview which followed on the 20th. The prosecution would then have been required to demonstrate that their force was dissipated prior to the second interview.

If the government failed to discharge this burden, the oral confessions of the 20th would have been inadmissible. As Judge Tuttle said in Williams v. United States, 328 F.2d 669, 671 (5th Cir. 1964), "where a confession has been obtained by means of inducement, the burden is on the prosecution to show that the operating force of the inducement has been brought to an end before any subsequent confession may be received." See also United States v. Gorman, 355 F.2d 151, 157 (2d Cir. 1965); Collins v. Beto, 348 F.2d 823, 828 (5th Cir. 1965); Killough v. United States, 1140 U.S.App.D.C. 305, 315 F.2d 241, 244, 245 (D.C.Cir. 1962), id. at 249 (Wright, J., concurring),[18] cf. Miranda v. State of Arizona, 384 U.S. 436, 496–497, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The showing made here was insufficient. The short lapse of three days would have little if any tendency to neutralize a threat of prosecution, or promise of immunity, if either occurred. And the fact that during this interval appellant consulted his counsel would have no greater effect. This was not a case in which the claim of involuntariness rested upon the accused's isolation or lack of knowledge of his rights, or upon lengthy uninterrupted interrogation, or fear of immediate physical violence, or the like. Access to counsel might well dissipate improper influences of this sort. However, it would have slight or no bearing upon whether the compulsion of a threat to prosecute appellant's family, or the inducement of a promise of their immunity, if present on the 17th, would have persisted as a

18. See also Inbau & Reid, Criminal Investigation and Confessions 192–93 (1962): "Once improper interrogation methods have been used on a subject, a presumption exists that their influence upon him is a continuing one. The prosecution must assume the burden of proving that when the subject confessed later on he was no longer dominated or affected by the influence of the earlier improper interrogation practices. Moreover, the courts have demanded a very high degree of proof to offset the presumption that prevails in favor of the accused.

Whenever an interrogator is called upon to interrogate a subject who has been mistreated or threatened, he should be informed (and the conditions surrounding the interview should so indicate) that no further mistreatment or threats will occur, and if a previous objectionable promise has been made it should be revoked in unmistakeable terms. Moreover, none of the persons who were in any way involved in the previous interrogation should be present at the subsequent one."

motivating factor in producing appellant's confession on the 20th.

It follows that the admissibility of the confession on the 20th could not be reliably determined without first determining whether improper influence was brought to bear upon the appellant on the 17th. Appellant was entitled to a reliable determination, by the court, of both the underlying factual issues and the voluntariness of his confession, and, in my opinion, the refusal of the trial court to consider the interview of the 17th, and its relationship to the interview of the 20th, was therefore error. Cf. Jackson v. Denno, 378 U.S. 368, 380, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

## IV

Appellant testified on his own behalf. The prosecutor asked him on cross-examination whether one of appellant's witnesses, Mr. Goslaw, was his "crime partner," and whether appellant and Mr. Goslaw had together robbed a named bank, not one of the four banks involved in the indictments. Appellant was required to answer over his objection.[19] He denied that he had participated in the robbery of the fifth bank and denied that he had previously admitted doing so. In rebuttal the government offered the testimony of an FBI agent that appellant had admitted committing the robbery with Mr. Goslaw.

It would have been improper and highly prejudicial for the government to attempt to impeach appellant by asking him to admit participation in a criminal act for which he had not been convicted (Thurman v. United States, 316 F.2d 205 (9th Cir. 1963); Ramirez v. United States, 294 F.2d 277, 284 (9th Cir. 1961); Enriquez v. United States, 293 F.2d 788, 794 (9th Cir. 1961); Mitrovich v. United

States, 15 F.2d 163, 164 (9th Cir. 1926); see also Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959); Abdul v. United States, 254 F.2d 292, 295 (9th Cir. 1958); Bloch v. United States, 221 F.2d 786, 790 (9th Cir. 1955); Allen v. United States, 115 F. 3, 11–12 (9th Cir. 1902)); yet that is the effect of what was done.

Even if appellant had been convicted of the offense it would have been improper to question him as to the details of the crime (United States v. Smith, 353 F.2d 166, 168–169 (4th Cir. 1965); McCormick, Evidence § 43, pp. 92–93; 1 Underhill, Criminal Evidence § 164, p. 312 n. 21); yet appellant was asked if he had used a .45-automatic weapon in the robbery and escaped in a stolen tan Oldsmobile; and the FBI agent testified that appellant admitted these and other details of the robbery, such as the amount of money stolen, and that the Oldsmobile was abandoned and the escape completed in a waiting truck which appellant had rented under a false name.

The government argues that its purpose was to impeach Mr. Goslaw, not appellant. The government had already used Mr. Goslaw's participation in the robbery for this purpose by obtaining Mr. Goslaw's admission on cross-examination that he had been convicted of this very offense. But the government argues that it was also entitled to show, as a further impeaching factor arising out of the same incident, that Mr. Goslaw might be biased in appellant's favor, since he and appellant had participated in the affair together.

On this theory, relevance of any part of the line of inquiry was remote at best, and testimony as to the details of the offense was wholly unjustified. It

19. The ground initially stated for the objection (that the question rested upon an unproven allegation) was inadequate, indeed misleading. However, appellant's counsel later objected to any proof that appellant had admitted the fifth robbery, and the government does not seek to support the trial court's action on the ground that appellant's objection was inadequately stated.

Also, the trial court, inconsistently, refused to permit the appellant to cross-examine the FBI agent along lines designed to weaken the government's claim that appellant had robbed the fifth bank.

was irrelevant to Mr. Goslaw's credibility that appellant carried a .45-caliber weapon during the robbery, escaped in a stolen car and switched to a truck rented under a false name, and took several thousand dollars. Testimony as to these details could only serve to enhance the risk that the jury would be diverted by a completely extraneous issue, and convict appellant because of an offense with which he was not charged. Boyd v. United States, 142 U.S. 450, 457–458, 12 S.Ct. 292, 35 L.Ed. 1077 (1892).

Moreover, as evidence of Mr. Goslaw's credibility, the entire line of inquiry was cumulative. Mr. Goslaw was a minor witness; his testimony was brief and relatively inconsequential. It would be unreasonable and unjust to admit otherwise improper testimony having such a direct and devastating impact upon appellant, simply because it might have a distant bearing upon Goslaw's credibility. Lucero v. Donovan, 354 F.2d 16, 22 (9th Cir. 1965). See also Powell v. United States, 347 F.2d 156, 158 (9th Cir. 1965).

On appeal the government argues that the evidence was relevant to the issue of appellant's purpose and intent. But the sole issue at the trial was whether appellant had participated in the robberies charged at all. Appellant's defense was alibi. Purpose and intent, as such, were not an issue (see United States v. Klass, 166 F.2d 373, 378 (3d Cir. 1948)), as they were in the cases upon which the government relies. Wood v. United States, 41 U.S. (16 Pet.) 342, 359–361, 10 L.Ed. 987 (1842) (intent to defraud), and Carbo v. United States, 314 F.2d 718, 745 (9th Cir. 1963) (intent to extort). See also Chow Bing Kew v. United States, 248 F.2d 466, 470 (9th Cir. 1957).

It was prejudicial error to permit the government to ask appellant whether he had robbed the fifth bank, and to offer extrinsic evidence rebutting his denial.

For the reasons stated in parts II B, III and IV of this opinion, I would reverse.