**UNITED STATES of America,**
**Appellee,**

v.

**Joseph D'ARGENTO, Mike LaJoy, Gerald Tomaszck and Patrick Schang,**
**Appellants.**

**Nos. 15287–15290.**

United States Court of Appeals
Seventh Circuit.

Jan. 5, 1967.

Rehearing Denied March 8, 1967.

Rehearing Denied March 8, 1967,
en banc.

See also 7 Cir., 359 F.2d 925.

Frank G. Whalen, Richard E. Gorman, George F. Callaghan, Maurice J. Walsh, John Powers Crowley, Chicago, Ill., for appellants.

Edward V. Hanrahan, U. S. Atty., Patrick J. Hughes, Jr., Chicago, Ill., John Peter Lulinski, Asst. U. S. Attys., of counsel, for appellee.

Before DUFFY, Senior Circuit Judge, and KNOCH and CASTLE, Circuit Judges.

DUFFY, Senior Circuit Judge.

After trial by jury, all defendants except Jean Schang were found guilty of violations of Title 18, U.S.C. § 2113 (Bank Robbery Statute). Defendant Jean Schang was charged with aiding and abetting the other defendants, but the jury found her not guilty.

Three groups of attorneys have and do represent one or more of the various defendants. All of the attorneys urge that the evidence was insufficient to sustain the guilty verdicts against their clients. All of them further contend that a lineup or showup conducted by agents of the Federal Bureau of Investigation resulted in violations of the Fifth Amend-

ment prohibition against compulsory self-incrimination, and the Sixth Amendment right to counsel.[1] These issues make necessary a somewhat detailed description of the bank robbery and events occurring shortly thereafter; also a description of the manner in which the lineup was conducted.

Evidence received at the trial disclosed that on September 23, 1963, at approximately 11:30 a. m., four masked men entered the Franklin Park bank in Franklin Park, Illinois. The number 1 man stayed near the front door of the bank. He wore coveralls, a long dark coat and he had a head covering on his head over a mask. The bank president, Mr. Beck, testified this man weighed 150 to 160 pounds, was 5'6" to 5'8" in height and was of solid build and stature.

The number 2 man leaped over a railing and entered cages 8 and 9, passing closely by the bank president. This man shouted directions such as "Stay where you are," "stand still," and "don't move." The number 2 man was well built, about 6' tall and weighed about 200 pounds. As did the others, he wrote a mask of T-shirt material with slits cut out over the eyes; he also wore dark gloves, one-piece coveralls, carried a revolver and also a cardboard carton upon which the name "Ballantine" appeared. This man took money from the cash drawers and placed it in the carton. The number 2 man then moved to other cages and gave directions such as "Get down on your knees" and "Cover your eyes."

The number 3 man was in the tellers' area behind the cages. He wore a coverall and a hood. The number 4 man was standing ten to twelve feet from where president Beck was standing. He was described as 5' 10" or 11" in height, and weighing from 175 to 180 pounds. He wore a one-piece coverall, a light tan jacket and a tightly fitted mask. He also wore dark colored gloves and held a revolver. Witnesses noted that this man had an unusual posture, holding his head in a forward position with his chin jutting out.

The robbers obtained $43,000 in cash, and as the four men were running away from the bank, they got into a black 1963 two-door Chevrolet Impala driven by a fifth man. An employee of the bank had alerted the local police and as the robbers drove away, they were followed in hot pursuit by two police cars. During the chase, one of the police officers observed two flashes from the back window of the Chevrolet, and noted that the window broke out. After following the getaway car for a short distance, the police lost sight of it.

Shortly thereafter, four men were observed getting out of a black Chevrolet automobile in an alley which ran in a northerly and southerly direction, and which separated Dora Street and Sarah Street. The automobile stopped opposite a garage at the rear of 3115 Dora Street. One man was observed jumping over the east fence of the alley and proceeding eastward; the other three men went in a westerly direction and entered the garage on the west side of the alley at 3115 Dora Street.

The black automobile continued westerly at a high speed. However, a short time thereafter, two police officers of the Franklin Park Police Department discovered a black 1963 Chevrolet automobile in the garage at the rear of 3115 Dora Street, the rear window of which was shattered. Two workman's caps, a used M-1 carbine shell and a white T-shirt with slits cut out were among the articles found in the automobile. A search of the house at 3115 Dora Street disclosed an M-1 carbine rifle, a pair of gloves and a "Ballantine" carton.

A brown coat containing a 25 caliber automatic pistol, a jacket and a pair of brown cotton gloves were found in a neighboring back yard. In front of the house at 3115 Dora Street, coveralls were

---

1. The defendant Patrick Schang was not arrested at the same time as the other defendants, and did not participate in the lineup. Therefore, no argument with respect to the lineup is made on his behalf.

found containing a 38 caliber snub-nosed revolver.

The residence at 3115 Dora Street was owned by Frank DeLegge, an uncle of the defendant LaJoy. A neighbor, Mrs. Sampson, upon hearing a screeching noise from outside, ran out of her house. She heard a door on the house at 3115 Dora Street close, and saw three men in the driveway. She identified one of them as LaJoy. She had seen him there previously on five different occasions. She also identified defendants Joseph D'Argento and Patrick Schang as being in the driveway at that time.

FBI agent Green testified he was the agent in charge of the investigation of the Franklin Park bank robbery. Between 3 p. m. and 5 p. m. on September 23, 1963, he was officially informed that warrants had been issued for the arrest of each of the defendants pursuant to an indictment which had been returned earlier that day. Plans were made by the FBI for a coordinated, simultaneous arrest of all of the defendants in their homes at 5 a. m. the next day. The agents were further instructed to make a search incidental to such arrests. Plans also were made for a lineup in which hte participants would be asked to repeat certain phrases and words that had been used by the robbers during the bank robbery.

The lineup was held in an ordinary large room in the FBI office with normal hanging ceiling fluorescent light fixtures. The rear lights were turned off and the front lights turned on so that the people in the lineup would not be able to clearly see the witnesses attending the lineup. Two separate lineups involving two different groups of witnesses were carried on so that the witnesses might be kept separate and not able to communicate with one another or observe what another witness might have written on the piece of paper.

Defendants LaJoy, Tomaszck and D'Argento took part in the lineup on the morning of September 27, 1963. The lineup started functioning about 10 a. m. Eighteen possible witnesses observed the lineup. Prior to viewing the persons in the lineup, the witnesses were informed they were going to observe a group of individuals. They were not told the names of the persons they would view, or their backgrounds.

Each person in the lineup was numbered. Three of the eight people in the lineup were defendants in the instant case. The other five were FBI agents or employees. Some of the FBI employees were attired similarly to the defendants. The witnesses were kept separated and were not permitted to communicate with one another. The witnesses were told that if they recognized any of the persons or the characteristics of any of the persons in the lineup, in any way, they should write down on a piece of paper the number of such person. They were also informed they would later be interviewed by the FBI agents concerning the number or numbers of the persons they had written down.

No names were used in addressing the participants in the lineup. They were addressed by their number only. Each man in the lineup was required to make statements in regular order beginning with No. 1. Each man stepped forward as he repeated various phrases. All of the persons in the lineup did this. The commands of the FBI agent were in the same tone of voice as to each person.

The holding of the lineup as hereinbefore described is the basis of the claim by defendants LaJoy, Tomaszck and D'Argento, that their rights to be protected against compulsory self-incrimination were violated. Defendant LaJoy states the issue as follows: Compelling the defendant Mike LaJoy, "after indictment, to exhibit himself and utter certain phrases in a lineup or showup * * * violates the Fifth Amendment's prohibition against compulsory self-incrimination, and any evidence derived therefrom is tainted and should be excluded."

■ The Government's position is that placement of a defendant in a lineup, whether or not he is required to speak words used by the perpetrator of the crime, is clearly not testimonial compul-

sion as prohibited by the Fifth Amendment to the Constitution. We agree with this view.

The courts have, quite generally, regarded a lineup as being a valid police procedure. In United States v. Evans, 3 Cir. (1966), 359 F.2d 776, a bank robbery case, it appeared a witness had identified the defendant in the lineup. The defendant was required to submit to the viewing at a time when he was already incarcerated on a different charge. The Court held the defendant was not deprived of any constitutional right even though defendant was required to wear sun glasses as did the robber during the holdup. The opinion cited and followed the decision in Rigney v. Hendrick, 3 Cir. (1965), 355 F.2d 710, cert. den. 384 U.S. 975, 86 S.Ct. 1868, 16 L.Ed.2d 685, where it was stated, p. 714—"We have found that the lineup procedure is both reasonable and consistent with the rules of fundamental fairness."

In Schmerber v. State of California (1966), 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908, the Supreme Court affirmed the right of the State of California at the direction of one of its police officers and over the objection of a defendant charged with driving an automobile while intoxicated, to withdraw at a hospital, a sample of his blood which was analyzed. The results of such analysis were introduced as evidence at his trial. This blood sample was withdrawn after Schmerber, acting upon advice of counsel, had refused to permit such withdrawal. The defendant strongly urged that such conduct violated his privilege against self-incrimination as secured to him against the states by the due process clause of the Fourteenth Amendment. The Supreme Court stated, at page 764, 86 S.Ct. at page 1832: " * * * both federal and state courts have usually held that it offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture." (Footnote omitted.)

In his discussion of the privilege against self-incrimination Wigmore suggests the privilege is limited to testimonial disclosures. 8 Wigmore, Evidence, § 2263 (McNaughton rev. 1961). Wigmore further indicates the following situations, among others, are not within the scope of the protection under such privilege: requiring a person to write for identification; to appear in court; to assume a stance; to walk or make a particular gesture; to speak for identification even though such evidence can only be obtained with the cooperation of the defendant. Id. § 2265. These sections of Wigmore were cited by the Supreme Court in Schmerber v. State of California, supra.

In Caldwell v. United States, 8 Cir. (1964), 338 F.2d 385, cert. den. 380 U.S. 984, 85 S.Ct. 1354, 14 L.Ed.2d 277, which was a bank robbery case, the defendant argued that being placed in a lineup violated his privilege against self-incrimination. The Court there was not faced with the additional issue of the defendant being required to repeat words or phrases. However, the language of the Court is significant. The Court said, page 389: "The mere viewing of a suspect under arrest by eyewitnesses does not violate this constitutional privilege because the prisoner is not required to be an unwilling witness against himself. There is a distinction between bodily view and requiring an accused to testify against himself."

▮ The evidence hereinbefore quoted, demonstrates that the lineup at which defendants LaJoy, Tomaszck and D'Argento appeared, was fairly conducted and we hold that by reason thereof there was no violation of the Fifth Amendment's prohibition against compulsory self-incrimination.

The second principal contention of defendant LaJoy [2] is that compelling him, after indictment, to exhibit himself in the lineup in the absence of his attorney or

---

2. This defense is adopted by defendants Tomaszck and D'Argento.

his express consent, violates his constitutional right to be represented by counsel as guaranteed by the Sixth Amendment. He relies upon Massiah v. United States (1964), 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246; Escobedo v. State of Illinois (1964), 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, and Wade v. United States, 5 Cir. (1966), 358 F.2d 557.

There certainly was no disposition on the part of the FBI agents to prevent any of the defendants from contacting counsel. Prior to the lineup, defendant D'Argento was assisted by agent McLean in placing a telephone call to his attorney. Likewise, Mrs. Schang was assisted by an FBI agent in her attempt to call an attorney after she told him the attorney's name at her home that morning. Defendant Tomaszck, upon being informed of his rights, indicated it was too early to call an attorney and upon leaving his home, requested his wife to do so.

In Williams v. United States (1965), 120 U.S.App.D.C. 244, 345 F.2d 733, cert. den. 382 U.S. 962, 86 S.Ct. 444, 15 L.Ed. 2d 364, the defendant was convicted of robbery and assault with a dangerous weapon. He was identified by three witnesses in a police lineup held shortly after the commission of the crimes and at a time when he was without counsel. The Court stated that although the lack of assistance of counsel had been held fatal to conviction in a variety of circumstances including Escobedo v. State of Illinois, supra, and Massiah v. United States, supra, the *Williams* case did not resemble factually those cases. The Court said, 345 F.2d page 734: "In the present case, especially in view of the fact that the evidence referred to consisted only of identification in a police lineup prior to indictment, the deprivation claimed cannot be held to have occurred."

Judge Burger wrote a concurring opinion in which he discussed the *Escobedo* holding, and concluded that a police lineup is not the type of interrogative activity forbidden by *Escobedo*.

In Kennedy v. United States (1965), 122 U.S.App.D.C. 291, 353 F.2d 462, the defendant insisted his Sixth Amendment right to counsel was violated as he was without counsel when identified at the scene of the robbery. Judge Burger wrote the majority opinion and rejected an absolute mechanical application of the *Escobedo* rule which, in his judgment, is directed to police efforts to elicit a confession from a defendant without counsel being present.

Counsel for defendant LaJoy relies heavily on Wade v. United States, 5 Cir. (1966), 358 F.2d 557.[3] However, in Wade, there are significant differences from the case at bar. Wade had been indicted for conspiracy to rob a federally insured bank. Counsel had been appointed for him at least two weeks prior to the lineup. It was six months after the robbery that the lineup occurred. No notice of the lineup was given to Wade's attorney. Just before the lineup was conducted, Wade was observed by two lineup witnesses in the custody of an officer. The Court posed the issue thus, at page 559: "It becomes necessary, therefore, only to determine here whether requiring Wade to submit to a lineup of the character that has been depicted above in the absence of counsel already assigned to him, deprived him of the aid of counsel at a critical stage of the prosecution. * * * *"

In *Wade*, Chief Judge Tuttle who wrote the majority opinion, referred to United States ex rel. Stovall v. Denno, 2 Cir. (1966), 355 F.2d 731, and stated 358 F.2d at page 559: "We find no reason to express a contrary conclusion so far as relates to the ordinary police lineup which is carried out under conditions which permit the greatest objectivity of viewing the accused with others who are exhibited with him."

In the instant case, the FBI went to great lengths to insure the fairness of the lineup procedure. Each defendant was advised of his rights and given the opportunity to obtain counsel. The lineup

3. The Supreme Court has granted certiorari in the *Wade* case and it is 87 S.Ct. 81, October Term 1966.

was held promptly on the day of the arrest, and thereafter, about thirty minutes from the time that the federal courts in Chicago were open for business, the defendants were turned over to the United States Marshal prior to being brought before a judge for the purpose of arraignment.

■■ In Gilbert v. United States, 9 Cir. (1966), 366 F.2d 923, the defendant argued that he had a right to counsel before being required to participate in the lineup. After referring to defendant's reliance on *Massiah, Escobedo* and other cases, the Court said, 366 F.2d page 940: "We think it clear that the foregoing cases do not require a holding that Gilbert had a right to consult counsel before being placed in a lineup, or to the presence of counsel at a lineup." We agree.

Defendants LaJoy, Tomaszck and D'Argento all complain that they were deprived of due process because, they say, the arresting agents failed to promptly bring them before the Court, or for the purpose of admission to bail, before a Commissioner, in compliance with Rule 9 (c), F.R.Cr.P.[4]

■ It should be noted that the indictment, by order of the District Court, was suppressed together with the warrants. Bail had been set for each defendant at $50,000. It was, therefore, unnecessary to bring the defendants before a court commissioner.

The delay of which defendants complain is the period from the time of the arrests at approximately 5 a. m. to about 10:45 or 11:00 a. m. when they were turned over to the United States Marshal to be brought into court.

After the arrests, a substantial period of time was spent in searching the premises incident to such arrest, preparing receipts for all items taken in the search, allowing the defendants to shave and dress, and transporting them from their homes to the FBI office. LaJoy and Tomaszck arrived there at about 8:45 a. m. D'Argento had arrived earlier and had been given coffee and a roll. All were fingerprinted and photographed. The lineup was held from 9:57 to 10:25 a. m.

■ During the period of which defendants complain, no confessions were made; no attempt was made to obtain confessions or statements from the defendants. We hold there was no unreasonable delay and that the defendants were not deprived of due process.

■ We reject the contention of each defendant that the evidence was insufficient to support the verdicts of the jury. We hold that the evidence, viewed in the light most favorable to the Government, supports the conclusion reached by the jury as to the guilt of all of the defendants.

■ Defendants LaJoy, Tomaszck and Schang produced alibi witnesses at the trial. It was the jury's duty and not ours to weigh the conflicting testimony.

Defendant LaJoy complains that the court erred in failing to give requested instruction "T."[5] He claims that in a colloquy (not found in the record on appeal), the Court indicated it would give such instruction, but that the Court did not inform counsel that such instruction would not be given until after the completion of the oral arguments.

■ Rule 30, F.R.Cr.P. does provide that the Court shall inform counsel of its proposed action upon request for instructions prior to the argument to the jury. However, we do not regard this failure in the instant case as reversible error in view of the Court's instruction which was given and which was based upon the Standard LaBuy instruction 6.04 relating to direct and circumstantial

---

4. Rule 9(c) provides that " * * * The officer executing the warrant shall bring the arrested person promptly before the court, or for the purpose of admission to bail, before a commissioner."

5. The requested instruction read as follows: "You may not draw any inference of guilt from any circumstance unless you have found that circumstance to be a fact proved beyond a reasonable doubt by the evidence."

**314**

evidence. We think the jury was sufficiently and properly instructed.

The defendants have raised additional questions which we have carefully considered. We think these contentions are without merit and do not warrant further detailed discussion.

The judgment of conviction and sentence entered by the District Court with respect to each of the defendants is

Affirmed.